WILLIAM H. MAULDIN AND ESTATE OF NATALIE E. MAULDIN, DECEASED, WILLIAM H. MAULDIN, EXECUTOR, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 314–71. Filed August 27, 1973.

*Hugo J. Melvoin* and *Stanton A. Kessler*, for the petitioners.

*Rex A. Guest*, for the respondent.

FEATHERSTON, *Judge:* Respondent determined deficiencies in petitioners' Federal income taxes for 1965, 1966, and 1967 in the amounts of $7,877.86, $8,560.17, and $6,517.40, respectively, and an addition to tax under section 6651(a)[1] in the amount of $2,140.04 for 1966. Due to concessions by petitioners, the issues remaining for decision require (1) the valuation of certain charitable contributions made during 1965 (corporate stock), 1966 (a collection of cartoons), and 1967 (original manuscripts and sketches) and (2) a determination of whether there was reasonable cause for petitioners' delay in filing their 1966 return.

FINDINGS OF FACT

*General*

William H. Mauldin (hereinafter petitioner or Mauldin) and Natalie E. Mauldin filed joint Federal income tax returns for 1965, 1966, and 1967. Their 1965 and 1966 returns were filed with the district director, Chicago, Ill., on August 1, 1966, and June 20, 1968, respectively. Their 1967 return was filed with the Internal Revenue Service, Manhattan, New York, on October 18, 1968. At the time the petition was filed, petitioners[2] were legal residents of Santa Fe, N. Mex.

---

[1] All section references are to the Internal Revenue Code of 1954, as in effect during the tax years in issue, unless otherwise noted.

[2] On Aug. 29, 1971, subsequent to the filing of the petition herein, petitioner Natalie E. Mauldin died. By order of this Court, dated Mar. 14, 1972, Estate of Natalie E. Mauldin, deceased, William H. Mauldin, executor, was substituted as a party, and the caption of the case was changed to that shown above. However, for convenience we shall refer to William H. Mauldin and Natalie E. Mauldin as petitioners.

Petitioner was born in Mountain Park, N. Mex., on October 29, 1921. Even as a child he was intensely interested in drawing. While still in high school, he took a correspondence course in cartooning, paying for it by doing drawings, posters, and other artwork for local industrial, commercial, or individual clients. In 1939 he studied cartooning at the Chicago (Illinois) Academy of Fine Arts.

In September 1940 petitioner enlisted in the Arizona National Guard. Five days later the National Guard was federalized, and petitioner was automatically taken into the Army. While in infantry training he began drawing cartoons for the 45th Division News (hereinafter called the News). This was initially done during his spare time, but later he became a member of the publication's staff. He remained in the United States until 1943, when he was sent overseas to Sicily and was assigned to the Mediterranean edition of Stars and Stripes, the Army's wartime newspaper.

Some of petitioner's cartoons for these two Army publications, the News and Stars and Stripes, depicted two young enlisted men named Willie and Joe. At first these characters were clean-shaven recruits, but gradually they evolved into a dirty, dull-eyed, bearded, combat-weary team. They brought petitioner international fame. His work came to the personal public attention of General George S. Patton, who threatened to ban Stars and Stripes from his area unless Willie and Joe were spruced up. His works were admired by General Eisenhower. His relationship with General Patton and other officers gave petitioner much publicity at home as well as among his fellow soldiers in Europe.

Petitioner's cartoons for the News and Stars and Stripes were brought together and published with accompanying text in several collections, including "Star Spangled Banter" (1941 and 1944) "Mud, Mules and Mountains" (1944), and "Up Front" (1945). After he returned to civilian life in June 1945, a collection of his postwar cartoons was published under the title "Back Home" (1947), and many of his Army cartoons were later collected in "Bill Mauldin's Army" (1951). In 1952 petitioner visited the battlefront in Korea and reported the experience in "Bill Mauldin in Korea" (1952). His other books, containing numerous cartoons, include "Sicily Sketchbook" (1944), "A Sort of Saga" (1949), and "I've Decided I Want My Seat Back" (1965).

In 1958 petitioner joined the staff of the St. Louis Post-Dispatch as an editorial cartoonist. A collection of his political cartoons covering the late Eisenhower and early Kennedy years was published as "What's Got Your Back Up?" (1961). In June 1962 he moved to the Chicago Sun-Times and began working under a syndicated political cartoonist contract with Field Enterprises, Inc. (hereinafter

Field). His latest book, "The Brass Ring," was published in 1971. Through the years he has written numerous articles which have been published in magazines and other periodicals. His cartoons are currently carried in about 250 newspapers throughout the country.

Three of petitioner's books, "Up Front," "Back Home," and "The Brass Ring," were Book-of-the-Month Club selections. The first of these books, "Up Front," was on the bestseller list for at least a year and sold millions of copies.

Petitioner's cartoons and writings have brought him many awards. He became the youngest Pulitzer Prize winner, at the age of 23, when he won journalism's highest honor in 1944 for one of his "Willie and Joe" cartoons. He added a second Pulitzer award in 1958 on the plight of the late Soviet author, Boris Pasternak: a cartoon of two prisoners in Siberia, one of whom was saying to the other, "I won the Nobel Prize for Literature. What was your crime?" In 1961 he received the Reuben Award from the National Cartoonists Society as cartoonist of the year.

Petitioner's drawings depicting a grieving Lincoln, published at President Kennedy's death, and a cartoon showing a field of graveyard crosses and bearing the legend "It's Ike himself. Pass the word," published at President Eisenhower's death, received nationwide attention. In a display at the Marshall Library Foundation is a series of panels depicting the life of General George C. Marshall, and in the center of the last panel, which includes the flag from his coffin and a photograph of the honor guard at the National Cathedral, is a Mauldin cartoon showing Willie and Joe standing at a simple cross on which General Marshall's five-star helmet is hanging.

When petitioner received his second Sigma Delta Chi (the national fraternity for journalism) award in 1970 for the Eisenhower cartoon, he was cited for his "rare ability to speak for a nation with a stroke of the pen."

## Issue 1. The 1965 Charitable Contribution

Throughout the period in controversy in this proceeding, petitioner was employed by Field to draw political and editorial cartoons for the Chicago Sun-Times. The first employment agreement between petitioner and Field was signed on June 4, 1962, covering the period from June 23, 1962, to June 22, 1965. On June 17, 1965, a similar agreement was executed covering the period commencing on the expiration of the first agreement and ending on June 22, 1975. However, either party could give notice of termination prior to March 22, 1970, and in case of such notice the second agreement was to terminate on June 22, 1970.

Both agreements provided that Field was to copyright in its own name—or, in the case of the June 1965 agreement, in its own name or that of the Chicago Sun-Times—"all material delivered by Mauldin hereunder which shall be published." During the respective terms of the agreements, Field was to be the owner of "all copyright and proprietary rights whatsoever in the cartoons and all art work relating thereto, and the titles, trade mark, trade name or names, characters, subject matter and plot or theme of or relating to the cartoons." Upon termination of the respective agreements, Field was to "assign and transfer to Mauldin or his legal representatives," these rights and the artwork in cartoons petitioner delivered to Field during the terms of the agreements.

Under each of the agreements, petitioner or his legal representatives had the sole and irrevocable right during the term thereof to license, sell, or otherwise dispose of subsidiary rights in the cartoons delivered to Field during the term of such agreement. The term "subsidiary rights" was defined as "any rights in and to the cartoons other than publication in the Chicago Sun-Times and the syndication of the cartoons to other newspapers and periodicals." The net proceeds from the disposition of these rights which were received either during the term of the agreement in which the cartoons were produced or at a later date through contracts entered into during the term of the agreement were to be divided equally between petitioner and Field.

On December 17, 1965, petitioner formed a corporation, Wil-Jo Associates, Inc. (hereinafter Wil-Jo), under the laws of the State of Delaware. Its authorized capital was 500 shares of common stock with no-par value and 500 shares of preferred stock, each share having a $100 par value. The common stock was divided into class A and class B with 100 and 400 shares, respectively. All voting power in the corporation was "vested exclusively in the holders of" the class A common stock. The redemption value of the preferred stock was $105 "per share, plus any dividends declared and unpaid." The certificate of incorporation also provided that:

The holders of Preferred stock shall be entitled to receive out of the net profits or net assets of the corporation applicable to dividends a non-cumulative dividend at the rate of five per cent (5%) per share per annum, and no more, payable annually on such date as the directors may determine before any dividend shall be set apart or paid on the Common stock provided, however, that whenever a dividend is paid on the Preferred stock the directors shall have the power in their discretion to declare and pay a dividend for a like period on the Common Stock.

In a letter dated December 28, 1965, a representative of Field acknowledged that Field considered petitioner "the copyright proprietor" of the cartoons delivered to that organization under the June 4, 1962, and June 17, 1965, agreements. Further, the company agreed

to execute whatever documents were needed "to evidence such copyright proprietorship."

In exchange for petitioner's transfer to Wil-Jo of his interest "in any and all copyrights which I may own on material prepared by me pursuant" to the agreements with Field, "together with any and all renewals and extensions of such copyrights," petitioner received 100 shares of Wil-Jo's class A common stock and 120 shares of its preferred stock. Wil-Jo's balance sheet as of December 31, 1965, shows the value of the copyrights to be $25,000. Of this amount, $12,000 is allocated to the preferred stock, $1,000 to common stock, and $12,000 to paid-in surplus.

The Federal income tax returns of Wil-Jo reflect gross income and taxable income for 1966 through 1971 in the following amounts:

| Year | Gross income | Taxable income | Year | Gross income | Taxable income |
|------|-------------|----------------|------|-------------|----------------|
| 1966 | $2,391.46 | ($35) | 1969 | $20,090.00 | $587.00 |
| 1967 | 4,054.72 | 729.72 | 1970 | 23,668.00 | 775.00 |
| 1968 | 27,030.00 | 597.99 | 1971 | 22,022.00 | 769.00 |

Since the year after its incorporation through 1971, Wil-Jo has paid the full annual 5-percent dividend of $600 on the outstanding 120 shares of its preferred stock. No dividends have been declared or paid on the class A common stock.

Near the end of December 1965, petitioner gave the 120 shares of Wil-Jo preferred stock to the Miralis Foundation, Inc. (hereinafter Miralis), a duly qualified tax-exempt charitable organization under section 501(c)(3).

In their 1965 return, petitioners deducted $11,755.33 as the value of the 120 shares of Wil-Jo preferred stock donated to Miralis. In the notice of deficiency, respondent determined that the value of the stock was $600 and denied the remainder of the claimed deduction.

## Issue 2. The 1966 Charitable Contribution

During the period of his military service, petitioner drew between 700 and 750 cartoons for the News and Stars and Stripes. At least 350–400 of these cartoons—most of which were drawn while petitioner was assigned to Stars and Stripes—involved the two characters named Willie and Joe. The first of these cartoons appeared in the News during the fall of 1940. After World War II, petitioner drew a few Willie and Joe cartoons dealing with their return to civilian life, but he did not think Willie and Joe looked right in this role, so he discontinued the series shortly after the surrender of Japan.

The Willie and Joe cartoons which originally appeared in the News and later in Stars and Stripes depicted in a unique way military life immediately prior to and during World War II. At first the two characters were receiving infantry training in the several camps at which Mauldin was stationed. By the time petitioner was assigned to

work for Stars and Stripes, the appearance of the two characters had changed from raw recruits to seasoned soldiers. In their final matured form, Willie and Joe were symbolic of the combat-weary, American infantrymen fighting in Europe during World War II. With a combination of humor and rebellious sarcasm, petitioner used these characters to reflect the war as seen through the eyes of millions of Army enlisted men.

These cartoons—"showing the humor, the sardonic feeling of the GIs, catching the irony, the grubbiness of war, but much more, an outcry against the pomposities and vanities of military life, a worm's-eye view of how ugly war is, far from all the fine speeches about patriotism"—were given wide exposure to the American people with the publication of "Up Front." The book, first published by Henry Holt & Co., Inc., in 1945, was a popular bestseller for many months and was reissued by W. W. Norton & Co., Inc., in 1968. Through its wide distribution, Willie and Joe became household characters of the World War II era.

Petitioner drew only one original of each Willie and Joe cartoon that he prepared. As in the case of his other cartoons, the rough sketches used to produce the originals were destroyed. The originals of these drawings quickly became collectors' items and, after the war, were avidly sought for World War II historical displays.

By 1966 many of the original Willie and Joe drawings had been lost or destroyed. At the time of the trial, petitioner had only 60–70 drawings left. The Army had been given 4; the Smithsonian Institution had received the 6 here in dispute; and some others had been given to West Point, the Library of Congress, and the Infantry Museum at Fort Benning.

As early as 1953 the Library of Congress began requesting some of petitioner's original cartoons and manuscripts. Beginning in 1962 and continuing over a period of more than 4 years, the Smithsonian Institution (hereinafter the Smithsonian or the museum), through its chairman of the Department of National and Military History and curator of the Division of Military History, Museum of History and Technology, repeatedly requested Mauldin to donate several original Willie and Joe cartoons for inclusion in a display the museum was planning on the history of World War II. In December 1966 petitioner acceded to these requests and gave six original drawings to the Museum.

These six drawings include the first and last of the Willie and Joe series. They show the evolution of the characters of Willie and Joe at the beginning of infantry training, during the war experiences, and, finally, upon their return to civilian life. The cartoons are as follows:

1. Willie and Joe in the early months of infantry training:

"Why, it's simple, Joe—We're doin' all dis NOW so when we GOTTA do it we'll know how. Git it?"—"Nope."

2. Willie and Joe awake in a tent:

"Y'know, I used to complain to th' landlord about me lumpy mattress."

3. Willie and Joe observing civilian looking quizzically at soldier asleep in a jeep:

"That's Mr. Sneed. He's trying to see where his tax dollar is going—."

4. Willie and Joe observing sad French or Italian civilian who'se farm had been the scene of a battle:

"Tell him to look at th' bright side o' things, Willie. His trees is pruned, his ground is plowed up, an' his house is air-conditioned."

5. Willie and Joe with a captured German general in a captured German automobile:

"He's pretty sore. He says we didn't even try to ketch his orderly."

6. Willie and Joe back in civilian life, reading a newsstory headlined "How MacArthur Beat Japan":

"Eisenhower wuz a piker. He needed an army to help him."

The original cartoons were accompanied by the following explanatory letter dated December 28, 1966:

The cartoon showing the two infantrymen in the mud, with the captions in old-fashioned balloons, and one line beginning, ". . . Why, it's simple, Joe . . ." is the first Willie and Joe cartoon. It was drawn in 1940 for the 45th Division News. The 45th, the first National Guard division to be mobilized under FDR's "Limited National Emergency Act" of 1940, had a great many Indians in its ranks, mostly from Oklahoma. Originally, my character, "Joe", was Joe Bearfoot, a Choctaw, who had no resemblance to any person, living or dead. He was strictly a cartoon character. His sidekick, a white man named Willie, was also pretty much a figment of the imagination, except that he might have been inspired, partially by one or two of my beer-drinking friends. You will notice that Joe, the Indian, has a hook nose, as does his white friend, Willie, except that Joe's was natural, whereas Willie's was probably broken.

The next two early cartoons, drawn during Louisiana maneuvers a year later, in 1941, show Willie and Joe in a later stage of development. Willie is still the hook-nosed Indian, but Joe has developed a button nose and a scraggly moustache. He also has developed something of a Bowery bum accent. He was at this point a sort of Regular Army type, vintage pre-war, and something of a cynic. You had the feeling that the National Guardsman had left a wife and kids at home, whereas the Regular took his pleasure where he could get it.

The two Up Front cartoons show Willie and Joe in their final, matured form. Willie and Joe have switched names, so that the one with the hook nose and underslung jaw is now Willie, a rather mature type, and the round-faced, slightly brash one, a few years younger, is Joe. Both are civilians at heart, both are sardonic about war and its causes and effects, and both will stick it out and do their jobs.

The last cartoon is the last of a very few I did after the war showing Willie and Joe as civilians. I had them working in a gas station, wearing surplus Air Force crushed caps. They never looked right to me in this role, and I stopped drawing them.

What you have here, then, are the first and last of Willie and Joe. (I did revive them briefly in one cartoon on the day General Marshall died, but that doesn't count.)

The gift to the Smithsonian was made with the understanding that petitioner was not transferring "any of the underlying literary or property rights" in the cartoons.

The Smithsonian does not undertake to make appraisals of materials contributed to it but does offer, from time to time, without expense, to obtain appraisals for its donors' use for Federal income tax purposes. In the case of Mauldin's gift, the curator of the Division of Military History made an official offer, on behalf of the Smithsonian, to obtain an appraisal of the gift. Mauldin accepted the offer, and the Smithsonian selected Forrest C. Pogue (hereinafter Pogue), Executive Director of the George C. Marshall Research Library, to make the appraisal. Pogue has an excellent reputation for integrity among professional historians, museum managers, and foundation people.

In a communication dated March 13, 1967, Pogue expressed the opinion that the collection donated to the Smithsonian by petitioner had a value of $15,000. His appraisal emphasizes the cartoons' "historical value, the genuine craftsmanship of the artist, [and] the affection in which the characters are held by veterans of the war."

In the summer of 1972, three of petitioner's original Willie and Joe drawings were sold for $900, $650, and $600. Each of these was an individual sale, and the drawings which were involved had no special significance in relation to the series as a whole.

In their 1966 return, petitioners deducted $15,000 as the value of their charitable contribution of these six cartoons. In the notice of deficiency, respondent allowed the deduction to the extent of only $150. On brief, respondent contends that "the value of such gift does not exceed $450.00."

## Issue 3. The 1967 Charitable Contribution

Since about 1953 the Library of Congress (sometimes hereinafter the Library) has been requesting petitioner to contribute some of his original cartoons and manuscripts to the national manuscript collection. As the national library for the United States, the Library tries to preserve original materials which record a picture of American life in all its aspects, whether the items are literary, political, social, or artistic in character. These materials are collected and maintained for the use of future historians.

On December 28, 1967, petitioner met with a representative from the Library at petitioner's home in Chicago. At that time petitioner made a gift to the Library of several items described in the Library's records as follows:

*Accession* * * * [14,016]

UP FRONT. Printer's copy, with some changes and editorial markings. 153 p.

COLLIER'S article on teenagers in the early 1950's: 7 original pencil sketches, done "in the field"

Photocopy of working typescript with many changes (43 p.), plus 40 p. typescript of revisions, together with research notes, background material, correspondence, and photographs

*Accession 14,199*

Two manuscripts:

The first is the printer's typescript of *Bill Mauldin in Korea* (W. W. Norton, 1952), consisting of front matter, foreword, and 98 pages of text, with numerous changes written in, but with no illustrations. This typescript is a mixture of various types of papers and of ribbon and carbon copy, with the l[a]tter predominating.

The second is the original typescript of *Up Front* (Henry Holt and Company, 1945), apparently written "in the field," as almost every sheet is stamped "Field Press Censor-Based for Publication" and initialed by the censor.

At the time petitioner made this gift to the Library, its representative was unable to take all the above-mentioned items back to Washington, D.C. Later, in 1968, petitioner shipped to the Library those items its representative had left behind.

The Library of Congress has issued regulations concerning evaluations of Library materials, setting forth the conditions under which it will undertake such appraisals, in pertinent part as follows:

Section 2. *Policy*

A. * * * its specialists will seek to ascertain the fair market value of library materials for the following purposes:

\* \* \* \* \* \* \*

(4) To advise a donor on the current market value of materials given to the Library;

\* \* \* \* \* \* \*

D. In the case of evaluations made under the provisions of * * * [paragraph] A. (4) * * * above, the evaluation shall be divulged only to the donor or his authorized agent, except under an order issued by a court having jurisdiction of a case in which the evaluation is submitted as evidence.

\* \* \* \* \* \* \*

Section 3. *Procedures*

\* \* \* \* \* \* \*

D. All evaluations shall be reported in writing by the Principal Evaluations Officer. On evaluation of $1,000 or over, the report shall bear the endorsement of all members of the Evaluations Committee who approve it. An individual written evaluation shall be submitted by any Committee member not concurring.

The Library's evaluation committee prepared a report concluding that the fair market value of this gift was $3,740. Since many people feel the Library's valuations are too conservative, donors have not always relied on the Library's appraisals to determine the proper amounts of their charitable contributions.

In their 1967 return, petitioners deducted $14,526 as the value of their contribution to the Library. In the notice of deficiency, respondent determined that the materials were worth $832 and denied the remainder of the deduction. In their petition, petitioners allege that the value of the donated items was not less than $7,270.

*Issue 4. Section 6651 Addition to Tax*

Prior to the time petitioners' 1966 return was due, petitioners supplied all the information needed to complete the return to the accounting firm handling their tax matters. On April 12, 1967, the accounting firm requested an extension of time from the Internal Revenue Service within which to file petitioners' 1966 return. An extension until June 15, 1967, was granted. On June 12, 1967, a similar request was made, and on June 27, 1967, the time for filing the return was extended to September 15, 1967. Respondent did not receive any other requests for extensions of time within which to file petitioners' 1966 return.

The accounting firm sent petitioners' 1966 return to them for signature on June 11, 1968, and petitioners filed the return on June 20, 1968. The accounting firm's delay in preparing the return was due to management problems within its organization.

#### ULTIMATE FINDINGS OF FACT

(1) The fair market value of the stock of Wil-Jo Associates, Inc., contributed to the Miralis Foundation, Inc., in 1965 was $8,000.

(2) The fair market value of the drawings contributed to the Smithsonian Institution in 1966 was $15,000.

(3) The fair market value of the papers contributed to the Library of Congress in 1967 was $5,000.

(4) Petitioners have not shown reasonable cause for their failure to file their 1966 income tax return within the time prescribed by law.

#### OPINION

Section 170(a)(1) provides that: "There shall be allowed as a deduction any charitable contribution (as defined in subsection (c)) payment of which is made within the taxable year." Section 170(c) defines the term "charitable contribution" as "a contribution or gift to or for the use of" certain specified types of entities. Section 1.170–1(c)(1), Income Tax Regs., provides that when property other than money is contributed to a charitable organization—

the amount of the deduction is determined by the fair market value of the property at the time of the contribution. The fair market value is the price at which the property would change hands between a willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having reasonable knowledge of relevant facts.[3]

In the present case the parties agree that Miralis, the Smithsonian, and the Library of Congress, to which the 1965, 1966, and 1967 gifts were made, respectively, are organizations of the character referred

---

[3] The Tax Reform Act of 1969, Pub. L. 91–172, 83 Stat. 487, prescribes a new set of rules for determining the amount of the charitable contribution deduction allowable for donations of certain types of property made after July 25, 1969.

to in section 170(c). Indeed, the notice of deficiency allowed petitioners charitable deductions for the gifts made during those years. The sole question is the proper amount of the deductions, i.e., the fair market value of the gift made during each year. The issue is factual and must "be resolved from a consideration and weighing of all the relevant evidence in the record." *Philip Kaplan*, 43 T.C. 663, 665 (1965).

### Issue 1. The 1965 Charitable Contribution

The only witness as to the fair market value, on December 28, 1965, of the 120 shares of Wil-Jo preferred stock was an expert testifying on petitioner's behalf. This individual was a stockbroker and a partner in "a broad lined investment firm." Based on his experience in the securities field, he testified that the stock was worth at least $10,000 on that date and expressed the opinion that it might have sold for as much as $12,000.

An examination of this witness's testimony in light of the record as a whole convinces us that the fair market value of the stock was $8,000 on December 28, 1965. The only evidence as to the value of the rights transferred to Wil-Jo does not indicate that they were worth less than the assigned value of $25,000. Since the dividends on the preferred stock were payable "out of the net profits or net assets of the corporation applicable to dividends," the paid-in surplus, shown in the December 31, 1965, balance sheet as $12,000, provided substantial assurance that the dividends would be paid for a considerable period. While petitioner's expert expressed the view that the Mauldin name would add to the salability and value of the stock, we think the rate of return and the absence of any concrete evidence as to how Wil-Jo was to operate and what its profits would be, as of December 28, 1965, require a discount to $8,000 for the stock.

### Issue 2. The 1966 Charitable Contribution

With respect to the fair market value of the six Willie and Joe cartoons contributed to the Smithsonian in December 1966, we have the testimony of three experts (including Pogue, selected by the Smithsonian) who testified for petitioner and of two experts who testified for respondent. Petitioner's experts, emphasizing the popularity of Mauldin as a World War II artist and cartoonist, the great publicity given the Willie and Joe series, and the unique quality of petitioner's talents, valued these six cartoons at $10,500 to $15,000, $15,000 to $20,000, and $15,000, respectively, as of the date petitioner contributed them to the Smithsonian.

Respondent's experts valued the six Willie and Joe drawings by reference to the prices paid for cartoons appearing in the comic

pages of the newspapers, such as "Dennis the Menace" and "The Katzenjammer Kids." One of these experts said the six drawings were worth between $25 and $50 each at the time of petitioner's gift, and the other witness said they were worth $75 each. Neither of these two experts explained the wide divergence between the values to which each testified and the much higher prices ($900, $650, and $600) paid for three of petitioner's cartoons in 1972. One of petitioner's experts reconciled those prices (lower than the values to which he testified) by pointing out that petitioner's gift to the Smithsonian included the first and last drawings in the Willie and Joe series and showed the progression of that series.

On consideration of the experts' testimony, as well as the other evidence, we think the record supports our finding that this group of cartoons had a value of $15,000 when petitioner contributed them to the Smithsonian in 1966. The extreme position taken by respondent's experts is hardly worthy of comment. Our finding has been influenced largely by three factors.

First, the evidence, telescoped in our Findings, shows that petitioner ranks as perhaps the greatest World War II artist and cartoonist. His drawings told the story of the life of the American soldier in a unique way—capturing the hearts, minds, and imagination of the soldier and civilian alike. He made Willie and Joe significant characters in the folklore of World War II.

Second, the generation most familiar with Mauldin's works had reached the age by 1966 when many of them had money which they could use for the collection of artworks of the kind given to the Smithsonian by petitioner and were interested in doing so.

Third, the value which we have found was assigned by an expert selected by the Smithsonian. We do not intend to imply that either this Court or the Internal Revenue Service is legally bound to accept the value found by the Smithsonian-selected expert. Petitioner's gift was not so conditioned. But we think fair play is missing where one Government agency repeatedly solicits contributions of artworks, promising that an expert will be selected to make an appraisal of the gift, and another Government agency, after the contribution has been made, ignores (or attacks) that appraisal. Yet, in substance, that has happened twice in this one case.[4]

As a minimum, the appraisal of the Smithsonian-selected expert is entitled to careful consideration and, absent bad faith, should be given great weight. Any weaknesses or infirmities in his appraisal or testimony in support thereof, as we view the evidence in this case, are

---

[4] In fairness to respondent, we point out that the Smithsonian-selected expert first expressed the opinion that the gift was worth only $10,000. However, he made this appraisal under the erroneous impression that the gift did not include the "last" World War II era Willie and Joe cartoon. Upon learning that it included the last one, he revised his appraisal upward to $15,000.

more than offset by the opinions of petitioner's other experts—both of whom are practical businessmen and dealers in art—as well as by the mountain of factual evidence in the record, only the highlights of which are summarized in our Findings.

### Issue 3. The 1967 Charitable Contribution

Each party has presented an expert witness who valued, as of December 28, 1967, the material petitioner contributed to the Library.[5] The values arrived at by petitioner's and respondent's experts were $7,270 and $1,600, respectively. An examination of their testimony, viewed in light of the other factors in the record, together with the degree of expertise evidenced by each and their respective familiarity with the material in question, leads us to conclude that the material was worth $5,000 on the date petitioner contributed it to the Library.

Here, again, a Government agency, the Library, repeatedly—the record contains 11 letters from the Library to petitioner, dated between August 12, 1953, and December 13, 1965—urged petitioner to contribute some of his original cartoons and manuscripts to the national manuscript collection. At least 3 of those letters mentioned the income tax deduction permitted for such contributions.

As noted in our Findings, a valuation committee, established and proceeding pursuant to formal Library regulations, estimated the value of petitioner's 1967 contribution of manuscripts—including the original and the field-censored manuscripts of "Up Front"—at $3,740. The representative of the Library through whose testimony the report was introduced testified that : "Many people feel that our evaluations are too conservative, and would rather try someone in the trade."

The experts all agreed that these original manuscripts had substantial value. That this is true is confirmed by the persistence of the Library in seeking the contribution. We think the record fully supports our finding that the papers had a fair market value of $5,000.

The Library appraisal was introduced in evidence through the testimony of the chief of the Exchange and Gifts Division of the Library. The committee members who actually made the appraisal did not testify. Respondent objected to the admissibility of the appraisal at the trial on the ground it was hearsay and urgently insists on brief that the evaluation should not be considered because respondent's coun-

---

[5] The portion of the 1967 deficiency involving the charitable deduction relates only to the value of the property petitioner contributed to the Library in that year. The notice of deficiency assigned a value to each item in the gift and treated the matter as though all the property was part of the gift made in 1967. At trial, respondent raised for the first time the question whether all this property had been actually contributed in 1967. Since this issue was not set forth in the pleadings and the pleadings were not amended to reflect it, we do not consider the issue properly before us. However, even if this issue were before us, it would constitute new matter, and under Rule 32, Tax Court Rules of Practice, the burden of proof would be on respondent. As we view the record, respondent would not have met that burden.

sel had no opportunity to cross-examine one of the committee members who signed the appraisal report.

This appraisal was not a casual statement by an unauthorized Government official or a collection of hearsay data by an investigating employee, such as a revenue agent. It was a formal appraisal, made by a committee created pursuant to the Library's official regulations, and it was made and transmitted to petitioner in fulfillment of a promise which the Library made when the gift was solicited.

While we do not adopt the figures in the appraisal as our finding as to value of the gift, we think the appraisal may be considered as an admission on behalf of the Government and may be taken into account in making our Findings. *Massman Const. Co.* v. *City Council of Greenville, Miss.*, 147 F.2d 925, 928 (C.A. 5, 1945) ; *Eastern Rotorcraft Corp.* v. *United States*, 184 Ct. Cl. 709, 719–720, 397 F.2d 978, 983 (1968) ; *George A. Fuller Co.* v. *United States*, 108 Ct. Cl. 70, 93–94, 69 F.Supp. 409, 411 (1947) ; cf. *United States* v. *Santos*, 372 F.2d 177, 180–181 (C.A. 2, 1967). If respondent really thought the testimony of a member of the Library evaluation committee would have aided the Court in arriving at its finding as to the gift's value, we do not think it unreasonable to have expected respondent to have arranged for that Government employee to testify. Cf. *Kean* v. *Commissioner*, 469 F.2d 1183, 1187–1188 (C.A. 9, 1972), affirming in part and reversing in part 51 T.C. 337 (1968).

### *Issue 4. Section 6651 Addition to Tax*

The last issue is whether petitioners are subject to the addition to tax imposed by section 6651(a) for failing to file a timely 1966 return. Petitioners argue that since they relied on their accountant to file their return or to apply for any needed extensions of time, their failure to file a timely return was due to "reasonable cause" within the meaning of that section.

The law is well settled that each taxpayer has the duty to file a timely return and that this obligation cannot be avoided by delegating to another party the responsibility for preparing and filing the return. *Estate of Frank Duttenhofer*, 49 T.C. 200, 205 (1967), affirmed per curiam 410 F.2d 302 (C.A. 6, 1969) ; *Jane U. Elliott*, 40 T.C. 304, 315 (1963). In the present case, petitioners' 1966 return was filed 9 months after the last extension had expired and 14 months after the date their return was originally due. In these circumstances petitioners' continued reliance on the accounting firm to handle this matter for them—without any proof that the firm had secured additional extensions of time in which to file the return—does not show the exercise of "ordinary business care and prudence" as required by section 301.-6651–1(c), Proced. & Admin. Regs. We hold that the addition to the tax is applicable.  *Decision will be entered under Rule 50.*