T.C. Memo. 2020-154

UNITED STATES TAX COURT

GURPREET S. PADDA AND PAMELA B. KANE, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 17338-16.                    Filed November 16, 2020.

<u>James A. Kutten</u>, for petitioners.

<u>Teri L. Jackson</u> and <u>William R. Peck</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

MORRISON, <u>Judge</u>:  The petitioners, Gurpreet S. Padda and Pamela B.

Kane, filed joint returns for 2010, 2011, and 2012.  The respondent (referred to

here as the IRS) issued a notice of deficiency determining the following

deficiencies in income tax, additions to tax, and penalties:

| [*2] Year | Deficiency | Addition to tax sec. 6651(a)(1) | Penalty sec. 6662(a) |
|---|---|---|---|
| 2010 | $380,934 | $94,579.75 | $76,186.80 |
| 2011 | 270,479 | -0- | 54,095.80 |
| 2012 | 424,963 | 20,931.85 | 84,992.60 |

Padda and Kane filed a timely petition. We have jurisdiction under section 6213(a).[1]

Padda and Kane have conceded the section 6651(a)(1) addition to tax for late filing for the 2010 year. Taking this concession into account, here are the remaining issues for decision:

(1)    Did Padda meet the material-participation requirements of section 469 for the activities of five restaurants and a brewery? We hold he did meet the requirements.

(2)    Did Padda receive a constructive dividend in 2010 because his wholly owned medical corporation[2] paid $81,828 of his expenses? We hold he did receive a constructive dividend.

---

[1]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years at issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

[2]Interventional Center for Pain Management, Inc. (Interventional Center).

**[*3]** (3)    Are Padda and Kane liable for a section 6651(a)(1) addition to tax for failing to timely file their 2012 return?  We hold they are liable.

(4)    Are Padda and Kane liable for accuracy-related penalties under section 6662(a) for 2010, 2011, and 2012?  We hold they are liable for the penalty under section 6662(a) for 2010 for the portion of the underpayment related to the constructive dividend.

FINDINGS OF FACT

The parties have stipulated some of the facts.  These facts are adopted by the Court as findings of fact.

Padda and Kane resided in Missouri when they filed their petition.

Padda and Kane are both medical doctors.  Kane practices medicine at a pediatric clinic.

Padda practices medicine through his wholly owned C corporation, Interventional Center, a pain-management clinic in St. Louis, Missouri, that he incorporated in the late 1990s.  Padda is the president of Interventional Center and has primary responsibility for its operations.  Interventional Center employed a number of physicians, nurse practitioners, chiropractors, and physical therapists during the years at issue.

**[*4]** During 2010 and 2011, Interventional Center's hours of operation were 8 a.m. to 5 p.m., Monday through Friday, and 10 a.m. to 1 p.m. on Saturday. In 2012, Interventional Center shortened its Friday hours to 8 a.m. to 1 p.m. Padda would typically work at Interventional Center for approximately three eight-hour workdays and two four-hour workdays, Monday through Friday. Once every few months he worked a few hours on a Saturday.

In 2006, Ami Grimes became the chief financial officer of Interventional Center. She maintained Interventional Center's books of accounts using the QuickBooks program. She entered Interventional Center's expenses and checks into the program.

During the years at issue, Padda was the sole shareholder and corporate president of Masala, Inc., an S corporation that operated a medical billing service for Interventional Center under the names eProBill and eProCollect. eProBill handled all of the medical billing for Interventional Center, and eProCollect handled the collection of overdue payments. Padda and other Interventional Center employees performed all of Masala's functions. Padda spent between 210 and 220 hours per year exclusively on work for Masala during 2010, 2011, and 2012.

**[*5]** Padda also operated another clinic called the Padda Institute Center for Aesthetic and Laser Medicine (Padda Institute). The Padda Institute was a medical spa specializing in skincare and laser hair removal treatments. It was open for business Monday through Saturday. Padda did not spend significant hours working on the business of the Padda Institute in 2010, 2011, or 2012. The corporate form under which the Padda Institute operated is not revealed by the record.

Between 2008 and 2012, Padda and Grimes opened five restaurants in the St. Louis area.

Each of the five restaurants was operated by a separate partnership. Thus:

- CA Group, LLC,[3] operated a full-service restaurant and bar under the name Chuy Arzolas. It opened in 2009 and closed in 2013.

- Cafe Ventana, LLC, operated a cafe serving food and beverages. It opened in 2008.

- Agave STL, LLC, operated a full-service restaurant and bar called Sanctuaria. It opened in 2009.

- Hendricks BBQ, LLC, operated a full-service restaurant and bar. It opened in August 2012 although planning for its operations occurred in 2010 and 2011.

---

[3]All limited liability corporations, or LLCs, mentioned in this opinion are entities treated as partnerships for federal tax purposes.

**[\*6]** ●     Diatina, LLC, operated a full-service restaurant and bar called Diablitos Cantina. It opened in 2011 and closed in 2017.

During the relevant years, Padda owned a 50% interest in each of the five restaurant partnerships; Grimes owned the other 50%. Grimes did not contribute cash or other property to acquire her interests in the partnerships. Although Padda owned only 50% of each of the five restaurant partnerships, he was allocated 100% of the losses. Grimes was not allocated any losses. The IRS does not challenge this loss allocation.

Padda also invested in a brewery operated by Ninkasi, LLC. During the years at issue, Padda owned a 90% interest in Ninkasi; Grimes owned 5% and Padda's brother (who was also his attorney) owned the remaining 5%. Ninkasi opened for business in 2008 and operated under the name Cathedral Square Brewery. Although Padda owned 90% of Ninkasi, he was allocated 100% of the losses. Grimes and Padda's brother were not allocated any of the losses. The IRS does not challenge this loss allocation.

Padda was the sole shareholder of Padda Equipment Co., an S corporation through which he purchased the furniture, fixtures, decor, and machinery for the five restaurants and the brewery. Padda spent some time exclusively on its operations.

[*7]  During 2010, Padda used Interventional Center's corporate credit card to pay for $81,828 of expenses for travel, meals, and event tickets.

On their 2010, 2011, and 2012 tax returns, Padda and Kane reported the following losses from the restaurants and the brewery as nonpassive (and they netted the losses against their nonpassive income):

| Company name | 2010 | 2011 | 2012 |
|---|---|---|---|
| CA Group | $375,390 | $186,298 | $49,418 |
| Cafe Ventana | 323,776 | 210,848 | 323,763 |
| Hendricks BBQ | 25,344 | 72,192 | 211,470 |
| Ninkasi | 149,657 | 38,692 | 214,019 |
| Agave STL | 278,739 | 47,677 | 100,665 |
| Diatina | n/a | 317,394 | 329,002 |
| Total | 1,152,906 | 873,101 | 1,228,337 |

Padda and Kane hired a certified public accountant, Sylvia A. Ehrenreich, to prepare their 2010, 2011, and 2012 federal income tax returns.  She had prepared Padda and Kane's returns since at least 2006.

Ehrenreich also prepared the corporate federal income tax returns for Interventional Center for 2010, 2011, and 2012.  Ehrenreich relied on the trial balance shown in Quickbooks for the amounts of meals and entertainment and travel expenses that were deducted on Interventional Center's 2010 return.  She was not asked to review any documentation related to these expenses, nor was she

[*8] asked to determine whether any of the expenses paid were personal or were properly substantiated.

Ehrenreich also prepared the federal income tax returns for the five restaurant partnerships and the brewery partnership for the years at issue.

On their 2010 return, Padda and Kane filed an "Election to Group Activities". They elected to group the following activities: (1) Ninkasi with 3914 Lindell, LLC; and (2) Cafe Ventana with 3919 West Pine, LLC. The business activities of 3914 Lindell and 3919 West Pine are not reflected in the record.[4]

For tax years 2006 through 2012, with the exception of 2011, Padda and Kane's federal income tax returns were filed with the IRS after the prescribed due dates (including extensions).

Padda and Kane's 2012 federal individual income tax return was due October 15, 2013. On October 15, 2013, Padda and Kane signed IRS Form 8879, "IRS e-file Signature Authorization" to authorize Ehrenreich's accounting firm to electronically file their 2012 Form 1040, "U.S. Individual Income Tax Return". On October 15, 2013, Ehrenreich's accounting firm was electronically filing several tax returns just before midnight. Ehrenreich's accounting firm created an

_____

[4]Both 3914 Lindell and 3919 West Pine are listed on Schedule E, Supplemental Income and Loss, of Padda and Kane's 2010 return in Part 1, Income or Loss From Rental Real Estate and Royalties.

[*9] electronic version of Padda and Kane's return on October 15, 2013, at 11:59 p.m. It transmitted the electronic version to the IRS on October 16, 2013, at 12 a.m. On October 16, 2013, the IRS rejected the return as a duplicate submission. Ehrenreich's accounting firm electronically resent the return on October 25, 2013, and it was received and accepted by the IRS the same day.

On May 2, 2016, the IRS issued a notice of deficiency to Padda and Kane for the 2010, 2011, and 2012 taxable years. The notice determined deficiencies for all three years based on the following determinations: (1) the restaurants and the brewery were passive activities for all three years and (2) Padda and Kane failed to report constructive-dividend income for 2010. As indicated at the beginning of the opinion, the notice of deficiency determined section 6662(a) penalties for all three years. Before the IRS issued the notice of deficiency, the group manager responsible for the examination of Padda and Kane's returns for the three years approved in writing the determination of the section 6662(a) penalties for those years.

## OPINION

The IRS's determinations in the notice of deficiency are generally presumed correct, and taxpayers generally bear the burden of proving otherwise. Rule

**[*10]** 142(a)(1); Welch v. Helvering, 290 U.S. 111, 115 (1933). Padda and Kane concede in their opening brief that they bear the burden of proof.

1.   Padda materially participated in the business operations of the five restaurants and the brewery during 2010, 2011, and 2012.

   a.   The relevant legal tests

Taxpayers are allowed deductions for certain business and investment expenses under sections 162 and 212. However, a taxpayer may not deduct losses from passive activities to the extent the losses exceed the taxpayer's income from passive activities. Sec. 469(a)(1), (d)(1); sec. 1.469-1T(a)(1)(i), Temporary Income Tax Regs., 53 Fed. Reg. 5700-5701 (Feb. 25, 1988). A passive activity is generally an activity involving the conduct of a trade or business in which the taxpayer does not materially participate. Sec. 469(c)(1).

Generally, taxpayers materially participate in an activity if they are involved in the operations of the activity on a regular, continuous, and substantial basis. Sec. 469(h)(1). Material participation in an activity may be established by any reasonable means. Sec. 1.469-5T(f)(4), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). Generally, "reasonable means" include the "identification of services performed over a period of time and the approximate number of hours spent performing such services during such period, based on

[*11] appointment books, calendars, or narrative summaries." Id. While daily time reports, logs, or similar documentation are not required, a taxpayer must provide other reasonable means to establish participation in the activity. Id.

A taxpayer can establish material participation in an activity by satisfying any one of seven tests set forth in section 1.469-5T(a), Temporary Income Tax Regs., 53 Fed. Reg. 5725-5726 (Feb. 25, 1988). Paragraph (a)(4) provides that the fourth test is met if the "activity is a significant participation activity * * * for the taxable year, and the individual's aggregate participation in all significant participation activities during such year exceeds 500 hours". A significant participation activity is a trade or business activity in which the individual participates for more than 100 hours during the year. Id. para. (c), 53 Fed. Reg. 5726.

For the purposes of determining whether the five restaurants and the brewery were passive activities, we assume without deciding that the five restaurants and the brewery each count as separate activities. A taxpayer may treat one or more trade or business activities as a single activity if the activities constitute an appropriate economic unit for the measurement of gain or loss for purposes of the passive-activity rules. Sec. 1.469-4(c)(1), Income Tax Regs. Once a taxpayer has grouped activities, the taxpayer may not regroup the activities

[*12] in later taxable years unless the taxpayer complies with disclosure requirements prescribed by the IRS. Id. para. (e)(1). On their 2010 return Padda and Kane elected to group Ninkasi with 3914 Lindell (an entity not at issue), and Café Ventana with 3919 West Pine (an entity not at issue). They did not elect to treat as a single activity any combination of the five restaurants and the brewery. The IRS argues that Padda and Kane cannot, for the purposes of this litigation, make a retrospective election to regroup their activities for the years at issue. Because (as we explain below) the time spent by Padda on each of the six activities exceeded 100 hours for each year without grouping any of the activities together, we need not determine whether Padda and Kane are entitled to regroup the activities.[5]

   b.    Padda's nontravel hours

Padda presented testimony to establish his hours spent on the restaurant and the brewery activities. He personally testified for an entire day of trial, explaining in detail his nontravel involvement in each restaurant and the brewery. Padda stated the nontravel hours he spent working on the restaurants and the brewery each year.

---

[5]For all hours calculations, we exclude the year 2010 for Diatina because no losses were claimed for Diatina for 2010.

[*13] Following Padda's testimony, 12 individuals testified regarding Padda's nontravel involvement in the restaurants and the brewery. They explained how Padda was involved in every aspect of the restaurants and the brewery. This included hands-on work and onsite instruction.

Padda's testimony was also directed to how many hours he spent on each activity for each year. For example, Padda testified that he spent 400 hours in 2011 on Cafe Ventana, of which 200 hours were spent on renovations.

On the basis of the testimony we described from Padda and the corroborating witnesses, we find that the nontravel time Padda spent on each activity exceeded 100 hours for each year at issue.

Because there are six activities involved in this calculation, our finding means that Padda annually devoted more than 600 hours (i.e., $6 \times 100 = 600$) of nontravel time to the five restaurants and the brewery. This conclusion is valid despite the IRS's skepticism that Padda could have spent significant time on the restaurants and the brewery given the demands of his work at his medical practice (which was highly successful) and the lack of documentary evidence of his personal involvement in the restaurants and the brewery. These reasons for skepticism might be well placed in another case. But the record in this case is consistent with our conclusions about Padda's hours. Padda did not use

**[*14]** correspondence or emails with respect to the restaurants and the brewery. Instead he used the telephone and face-to-face meetings. Using these means of communications, Padda exercised tight control of many aspects of the restaurants and the brewery. In particular, he paid close attention to the quality and ingredients of the food and beverages. He also rigorously controlled the decor and appearance of the establishments. His employees confirmed his heavy involvement. They complained in their testimony about his micromanagement. Perhaps as a result of Padda's efforts, the restaurants and the brewery were lavishly appointed. The food and beverages were of the highest quality. The restaurants and the brewery were also costly to operate. Year after year, they produced massive financial losses that largely wiped out Padda's profits from his medical practice. Thus it was that Padda was a successful doctor and at the same time spent significant time on the restaurants and the brewery.

      c.    <u>Padda's travel hours</u>

In addition to the nontravel time he spent working on the five restaurants and the brewery, Padda spent time traveling. Grimes accompanied Padda on most of his trips. Grimes testified at length about the business nature of the trips using her personal knowledge. Credible testimony by Padda and by Grimes established that the trips were factfinding trips for the five restaurants and the brewery. They

[*15] testified about how visits to particular establishments were related to particular Padda-owned restaurants or the brewery.

Furthermore, Grimes created three spreadsheets before trial to summarize Padda's travel during 2010, 2011, and 2012, respectively. The spreadsheets showed dates of travel, destination cities, and the names of bars, restaurants, and breweries visited. Grimes testified extensively about the spreadsheets. Padda and Kane exchanged with IRS counsel the documentation on which the spreadsheets were based (credit-card receipts and invoices). The parties stipulated the admissibility of the spreadsheets, and they were admitted.

According to the spreadsheets and Grimes's testimony, Padda's traveltime related to the five restaurants and the brewery was 1,900 hours in 2010, 1,900 hours in 2011, and 1,100 hours in 2012. These hourly amounts are based on a 24-hour day, meaning that for a particular trip, every hour of each day of the trip was counted, including time Padda spent not working (i.e., sleeping). If one were to divide the annual traveltime totals by three to account for a typical eight-hour work day, Padda's restaurant and brewery traveltime becomes 633 hours in 2010; 633 hours in 2011; and 366 hours in 2012. We find these traveltime totals reliable when adjusted as described.

**[\*16]** The preponderance of evidence, which includes the spreadsheets, Padda's testimony regarding his travel, and Grimes' testimony regarding Padda's travel, shows that Padda spent at least 25 hours of travel time during each year at issue on each of the five restaurants and the brewery. This is in addition to more than 100 hours of nontravel time that we find Padda spent each year at issue on each of the five restaurants and the brewery.

d.   Padda's total hours, travel and nontravel

For each activity for each year (i.e., for each of the restaurants and the brewery), Padda's hours exceeded the 100-hour threshold required for an activity to be a significant participation activity.[6] This is because for each activity and for each year his nontravel hours exceeded 100 hours and his travel hours exceeded

---

[6]Not all time spent on a business activity counts as participation for the purposes of these rules. Work performed in an individual's capacity as an investor does not qualify as participation unless the individual is directly involved in the day-to-day management or operations. Sec. 1.469-5T(f)(2)(ii)(A), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988). Sec. 1.469-5T(f)(2)(ii)(B), Temporary Income Tax Regs., 53 Fed. Reg. 5727 (Feb. 25, 1988), enumerates the types of investor activities excluded from material participation. Investor-type work includes studying and reviewing financial statements or reports on operations of the activity; preparing or compiling summaries or analyses of the finances or operations for the individual's own use; and monitoring the finances or operations in a nonmanagerial capacity. Id. None of Padda's activities are those listed in subdiv. (ii)(B). Therefore, we find that Padda's participation in the five restaurants and the brewery is not excluded as investor-type work as the IRS alleges.

[*17] 25 hours. Each activity was therefore a significant participation activity for each year. See sec. 1.469-5T(c), Temporary Income Tax Regs., supra. Because for each year Padda had at least these six significant participation activities,[7] his aggregate participation in all significant participation activities during the year exceeded the 500-hour threshold of section 1.469-5T(a)(4), Temporary Income Tax Regs., supra. The five restaurants and the brewery were not passive activities.

2.     Padda and Kane failed to report dividend income in 2010 for expenses paid by Interventional Center.

A distribution of property made by a corporation to a shareholder with respect to its stock is governed by section 301(c). Sec. 301(a). Under section 301(c)(1), a distribution that is a "dividend" is includable in the shareholder's income. See also sec. 61(a)(7). A dividend is any distribution a corporation makes to its shareholders out of earnings and profits. Sec. 316(a).

One type of distribution governed by section 301(c) is a constructive distribution. United States v. Smith, 418 F.2d 589, 593 (5th Cir. 1969). To determine whether a shareholder received a constructive distribution, this Court looks to whether the distribution was primarily for the shareholder's benefit rather than for the corporation's benefit. Hood v. Commissioner, 115 T.C. 172, 179-180

---

[7]For 2010, Padda had no activities for Diatina, and therefore there were five significant participation activities rather than six.

**[*18]** (2000). The determination of whether the shareholder or the corporation primarily benefits is a question of fact. Id. at 180.

During 2010, Padda (Interventional Center's sole shareholder) used Interventional Center's corporate credit card to pay $81,828 of travel, dining, and entertainment expenses for himself, his family, and his friends. Padda and Kane do not dispute that Interventional Center had sufficient earnings and profits to cause the $81,828 of expenses in 2010, if characterized as a distribution, to be dividends.

Interventional Center reported deductions of these amounts on its corporate return. Padda and Kane argue that the IRS entered into an agreement with Interventional Center whereby it was allowed a business expense deduction for all or some of the $81,828. Padda and Kane contend that the IRS is legally barred from taking the position in this proceeding that the $81,828 in payments is a constructive distribution to the extent the same payments were allowed as a deduction to Interventional Center as part of the settlement agreement between the IRS and Interventional Center.

It is undisputed that the IRS examined Interventional Center's corporate income tax return for 2010 and that the IRS reached an agreement with Interventional Center about its income tax liability for that year. But that

**[\*19]** settlement has no effect on the determination of Padda and Kane's income.

First, the settlement expressly governed only the question of whether

Interventional Center was entitled to deductions. The settlement did not purport to

address the question of what amounts are includable in Padda and Kane's income.

Second, Interventional Center was a party to the settlement agreement, and Padda

and Kane were not.

At trial, Padda and Kane attempted to introduce into the record documents

marked as Exhibits 20-P, 49-P, 50-P, 51-P, and 52-P and related testimony (Tr.

250-256, 758-761) to prove which payments were governed by the settlement.

The IRS objected. The Court reserved ruling on the objection. We need not rule

on the objection. The evidence would have no effect on the outcome of this case.

The settlement has no effect on Padda and Kane's income, as explained above.[8]

The question of whether Interventional Center's payment of the $81,828 of

Padda's expenses is a constructive dividend depends on whether Interventional

---

[8]Padda and Kane also argue that the IRS is bound by a duty of consistency to treat the reimbursements as other than distributions. The duty of consistency is an obligation by which a representation made by a taxpayer to the IRS may be binding on the taxpayer if the IRS relies on the representation to its detriment. See, e.g., Beltzer v. United States, 495 F.2d 211, 212 (8th Cir. 1974). Even if the duty of consistency governs the IRS (as opposed to taxpayers), the record does not show that the IRS made a representation to Padda and Kane on which they detrimentally relied.

[*20] Center primarily benefited from paying the expenses. If it did primarily benefit, then the payment is not a constructive dividend. If it did not, then the payment is a constructive dividend.

Padda testified that as a general matter there was a business purpose for the $81,828 in expenses. In our view, the testimony suggested that the business purpose of the $81,828 in expenses was related to the five restaurants and the brewery, not Interventional Center. We also observe that a portion of the $81,828 in expenses corresponds to the travel activities conducted by Padda for the five restaurants and the brewery during 2010. See supra Part 1.c. Grimes and Padda both testified about these travel activities, and Grimes created a spreadsheet for each year about them. We concluded supra Part 1.c that the travel activities were related to the five restaurants and the brewery.

The evidence we described in the paragraph above is the only evidence regarding the $81,828 in expenses. The preponderance of the evidence shows that the $81,828 did not benefit Interventional Center.

Therefore, we conclude that Padda and Kane received an $81,828 constructive dividend in 2010 for the travel, dining, and entertainment expenses paid by Interventional Center.

**[\*21]** 3.　　Padda and Kane are liable for a section 6651(a)(1) addition to tax for failing to timely file their 2012 return.

Section 6651(a)(1) imposes an addition to tax for failure to file a tax return by its filing deadline (as extended) unless the taxpayer can establish that the failure to timely file is due to reasonable cause and not due to willful neglect.  The section 6651(a)(1) addition to tax is 5% of the amount required to be shown on the return if the failure is for not more than one month.  Sec. 6651(b)(1).

The IRS bears the burden of production for additions to tax determined under section 6651(a)(1).  See sec. 7491(c); Higbee v. Commissioner, 116 T.C. 438, 446-447 (2001).  The IRS satisfies its burden by producing sufficient evidence to establish that the taxpayer failed to timely file a required return.  See Wheeler v. Commissioner, 127 T.C. 200, 207-208 (2006), aff'd, 521 F.3d 1289 (10th Cir. 2008); Higbee v. Commissioner, 116 T.C. at 447.  Once the IRS has satisfied its burden of production, the taxpayer has the burden of proving that the lateness was due to reasonable cause and not willful neglect.  Higbee v. Commissioner, 116 T.C. at 447.  Reasonable cause excusing a failure to timely file exists if the taxpayer exercised ordinary business care and prudence but nevertheless was unable to file the return by the deadline.  See sec. 301.6651-1(c)(1), Proced. & Admin. Regs.  Willful neglect means a conscious,

[*22] intentional failure, or reckless indifference.  United States v. Boyle, 469 U.S. 241, 245 (1985).

Padda and Kane's 2012 return was due on October 15, 2013.  The parties have stipulated that the return was filed on October 25, 2013.  Padda and Kane seek to avoid the addition to tax because they claim that Ehrenreich's accounting firm was responsible for the untimeliness.

In considering whether a taxpayer has exercised reasonable care and prudence, courts have held that the taxpayer's duty to file a timely return cannot be avoided by delegating to another party, including an accountant, the responsibility for preparing and filing the return.  Mauldin v. Commissioner, 60 T.C. 749, 762 (1973); see also Boyle, 469 U.S. at 251-252 (holding that reliance on an agent to file a return does not establish reasonable cause because "[i]t requires no special training or effort to ascertain a deadline and make sure that it is met").[9]  Padda and Kane argue that the reason that their 2012 return was filed late was that

---

[9]As explained in the text, reliance on an accountant to file a return is not reasonable cause for the failure to file on time.  Reasonable cause for failure to file may be established when a taxpayer relies on a competent adviser who advises that the taxpayer is not required to file a return.  Evans v. Commissioner, T.C. Memo. 2016-7, at *43.  There is no evidence that Padda and Kane received this type of advice.  See United States v. Boyle, 469 U.S. 241, 251-252 (1985); Mauldin v. Commissioner, 60 T.C. 749, 762 (1973); Niv v. Commissioner, T.C. Memo. 2013-82, at *24; Owusu v. Commissioner, T.C. Memo. 2010-186, slip op. at 13.

**[*23]** (1) Ehrenreich's accounting firm pressed a button only a few seconds late, (2) they relied on Ehrenreich's accounting firm to timely file the return, and (3) they themselves could not have pressed the button to timely file the return. Even if sometimes it might be reasonable for a taxpayer to rely on his or her accountant to timely file his or her returns (contrary to the caselaw), it was not reasonable in this particular case for Padda and Kane to rely on Ehrenreich's firm to timely file their return. Padda and Kane have relied on Ehrenreich's firm to file their returns every year since at least 2006. And every year since then, except for 2011, their return was filed late. Yet they have continued to use Ehrenreich's firm to file their return year after year. Padda and Kane's failure to ensure that Ehrenreich's firm timely filed their 2012 return demonstrates a lack of ordinary business care, particularly in the light of the firm's history of delinquent filings.

We find that Padda and Kane do not have reasonable cause, on the basis of any reliance on Ehrenreich's firm for their untimely 2012 return, and we hold that Padda and Kane are liable for the section 6651(a)(1) addition to tax for failing to timely file their 2012 return.

[*24] 4.    <u>Padda and Kane are liable for a section 6662 penalty for 2010, but not 2011 and 2012</u>.

Section 6662(a) and (b)(1) and (2) imposes a penalty equal to 20% of any portion of an underpayment of tax that is attributable to negligence or to a substantial understatement of income tax.  An underpayment is the difference between the correct tax and the tax reported on the return, with exceptions not relevant here.  Sec. 6664(a).  Negligence includes any failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return.  Sec. 6662(c); sec. 1.6662-3(b)(1), Income Tax Regs.  Negligence may also include the failure to properly substantiate an item.  <u>Higbee v. Commissioner</u>, 116 T.C. at 449; sec. 1.6662-3(b)(1), Income Tax Regs.  A substantial understatement of income tax exists if (1) the understatement exceeds 10% of the tax required to be shown on the return and (2) the understatement exceeds $5,000.  Sec. 6662(d)(1)(A).  An understatement is the difference between the correct tax and the tax reported on the return, with exceptions not relevant here.  Sec. 6662(d)(2)(A).

For any penalty the IRS determines applies to an individual, section 7491(c) imposes the burden of production on the IRS.  <u>Higbee v. Commissioner</u>, 116 T.C. at 446.  This means that the IRS is required to come forward with sufficient

**[\*25]** evidence that it is appropriate to impose the penalty. Sec. 7491(c); <u>Higbee</u> <u>v. Commissioner</u>, 116 T.C. at 446.

No section 6662 penalty is imposed with respect to any portion of an underpayment if it is shown that there was a reasonable cause for such portion and that the taxpayer acted in good faith with respect to such portion. Circumstances that indicate reasonable cause and good faith include reliance on the advice of a tax professional. Sec. 1.6664-4(b), Income Tax Regs. The taxpayer has the burden of proving that he or she acted with reasonable cause and in good faith. Rule 142(a); <u>Higbee v. Commissioner</u>, 116 T.C. at 446-447.

The notice of deficiency determined that Padda and Kane were liable for penalties under section 6662(a) for 2010, 2011, and 2012. The underpayments for all three years, as calculated in the notice of deficiency, were due to Padda's failure to meet the material-participation requirements. The underpayment for 2010 was due also to Padda and Kane's failure to report as their income the $81,128 in Padda's credit-card expenses that Interventional Center paid.

However, we have concluded <u>supra</u> Part 1 that Padda met the material-participation requirements. Therefore, Padda and Kane's potential penalty under section 6662 is limited to the tax year 2010. And the underpayment for that year

**[\*26]** relates to Padda and Kane's failure to report the $81,828 of Padda's credit-card expenses paid by Interventional Center.

The IRS satisfied its burden of producing evidence that Padda and Kane acted negligently in failing to report the $81,828. Padda and Kane failed to provide their accountant, Ehrenreich, with the information necessary to ascertain whether Interventional Center's $81,828 payment of credit-card expenses was includable in their income as a constructive dividend. They did not solicit or receive advice from Ehrenreich on the tax consequences of paying the expenses with Interventional Center funds.

Padda and Kane, who bear the burden of persuasion, have not adduced sufficient evidence that the IRS's negligence determination was incorrect. Nor have they argued that the negligence determination was incorrect.[10]

We conclude that the underpayment for 2010 is due to negligence. Therefore, Padda and Kane are liable for the section 6662 penalty for 2010, although in a lesser amount than the amount computed in the notice of

---

[10]For example, Padda and Kane do not argue that they had reasonable cause and good faith with respect to the $81,828 because they relied on Ehrenreich. Such a defense would be without merit anyway because, as we explain in the text, they failed to supply Ehrenreich with necessary information about the credit-card expenses and received no advice from her regarding the tax consequences of payment of the expenses by Interventional Center.

[*27] deficiency.[11] Computations under Rule 155 will determine the amount of the underpayment and the amount of the penalty. Computations under Rule 155 will also determine whether there is a substantial understatement for 2010. If there is a substantial understatement, that will serve as an alternative basis for liability for the penalty.

To reflect the foregoing,

<u>Decision will be entered under</u>

<u>Rule 155</u>.

---

[11]The parties stipulated that the IRS satisfied the penalty-approval requirement in sec. 6751(b) with respect to the penalties under sec. 6662.