ESTATE OF GEORGE C. DE VOS, GEORGE B. CATLIN, ADMINISTRATOR, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Estate of De Vos v. Commissioner
Docket No. 4517-73.
United States Tax Court
T.C. Memo 1975-216; 1975 Tax Ct. Memo LEXIS 162; 34 T.C.M. (CCH) 933; T.C.M. (RIA) 750216; June 30, 1975, Filed James L. Howlett, for the petitioner. Daniel J. Westerbeck, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined a deficiency in the estate tax of the Estate of George C. DeVos in the amount of $3,805 and an addition to tax under section 6651(a), I.R.C. 1954, [1] for failure to timely file the estate tax return in the amount of $5,142. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision *164 the following: (1) Whether the $80,000 proceeds of a life insurance policy on decedent's life of which Margaret DeVos, decedent's former wife, was beneficiary are includable in decedent's gross estate and, if so, whether the estate is entitled to a deduction under section 2053(a) either for the amount paid under that policy or for the amounts paid to other beneficiaries under two policies which, under a divorce decree, decedent was required to assign to Margaret DeVos, one for a period of 5 years only. (2) Whether the failure of the administrator of decedent's estate to timely file the estate tax return was due to reasonable cause and not to willful neglect within the meaning of section 6651(a). FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. George B. Catlin, the duly qualified administrator of the Estate of George C. DeVos, is a resident of Grosse Pointe Woods, Michigan and had his office in Detroit, Michigan at the time the petition in this case was filed. Mr. Catlin filed the Federal estate tax return for the estate of George C. DeVos with the internal revenue service at Detroit, Michigan, on March 24, 1970. George C. DeVos(hereinafter *165 decedent) died on January 3, 1968. Mr. Catlin was appointed as administrator of decedent's estate on February 27, 1968, and was issued letters of administration by the Probate Court of the County of Oakland, State of Michigan, on March 11, 1968. Prior to March 28, 1966, decedent was married to Margaret DeVos (hereinafter Margaret). Margaret filed a suit for divorce from decedent in the Oakland County Circuit Court and on March 28, 1966, was granted a judgment of divorce. The divorce decree provided in part as follows: ALIMONY
That the Defendant, George DeVos, shall pay the sum of $75.00 a week to the Plaintiff, Margaret DeVos, as alimony, for a period of five years, said five year period to be computed from January 17, 1966 and not from the date of this Judgment, and such alimony to continue whether the Plaintiff, Margaret DeVos marries or not; however, such alimony to be suspended in the event of the death of either the Plaintiff, Margaret DeVos, or the Defendant, George DeVos. PROVISION IN LIEU OF DOWER
IT IS FURTHER ORDERED, ADJUDGED and DECREED, that George DeVos, Defendant herein shall pay to Margaret DeVos, Plaintiff, the sum of One and no/100 ($1.00) Dollar, *166 and that this provision herein shall be in lieu of her dower in the lands of her husband, and that he shall hereafter hold his remaining lands free, clear and discharged from any such dower right or claim and said provision shall also be in full satisfaction of all claims that she may have in any property which he owns or may hereafter own, or in which he has or may hereafter have any interest. INSURANCE PROVISION
IT IS FURTHER ORDERED, ADJUDGED and DECREED that the Defendant, George DeVos, shall forthwith assign to the Plaintiff, Margaret Devos, a certain $6,000.00 life insurance policy issued by the Prudential Life Insurance Company, and insuring the life of Defendant, George DeVos; and in addition, the Defendant, George DeVos shall assign to the Plaintiff, Margaret DeVos, a certain $10,000.00 life insurance policy insuring Defendant, and issued by the John Hancock Life Insurance Company, said assignment to be effective for a period of five years only from the date of this Judgment, after which time it is to be reassigned to Defendant, George DeVos by Plaintiff, Margaret DeVos. The Plaintiff shall hereafter have no further interest as beneficiary or otherwise in and to any *167 other life insurance policies, endowment, or annuity contract standing in the name of or insuring the life of the Defendant. The decedent never actually assigned the two policies specified in the divorce decree to Margaret. After the divorce decree was entered, Margaret and her attorney both contacted decedent with respect to the assignment of the two insurance policies to Margaret. The day following a visit to decedent by Margaret's attorney, decedent called Margaret and asked her to meet him in order that he might deliver to her an insurance policy. Instead of decedent meeting Margaret, Ralph Whipple, Jr., an employee of Royal Oak Heat Treat, Inc., of which decedent was president, met Margaret and handed her an envelope. The envelope had been handed to Mr. Whipple by decedent with the request that Mr. Whipple meet Margaret and give her the envelope. Margaret opened the envelope and noticed that it contained one insurance policy on decedent's life and that the beneficiary was designated as "Margaret Ann DeVos--Ex-Wife." Since the policy was not either of the policies mentioned in the divorce decree, Margaret contacted decedent and was told that the policy which had been delivered *168 to her was a substitute for the other two policies. She asked decedent to talk to her attorney and understood that decedent was to talk to her attorney. She did nothing further. The policy which was delivered to Margaret was a group life insurance policy issued by Travelers Life Insurance Company and owned by decedent's employer, Royal Heat Treat, Inc. (hereinafter referred to as ROHT), under the terms of which decedent held the right to designate the beneficiary. The policy was in the amount of $40,000 and carried an additional $40,000 benefit for accidental death. Upon decedent's death, the Travelers Life Insurance Company paid to Margaret $40,000 in the latter part of January and an additional $40,000 in the latter part of February in discharge of the policy in which she was named beneficiary. The two checks were delivered to Margaret by Mr. Whipple. The Prudential Insurance Company policy referred to in the divorce decree was paid to Joan B. Logan DeVos, the beneficiary designated therein, who was decedent's wife at the date of his death. The payment was in the amount of $12,177, $6,000 being the face amount of the policy, $6,000 accidental death benefit, and the remaining $177 *169 accumulated and current dividends. The John Hancock Mutual Life Insurance Company policy was paid to the beneficiary designated therein, who was Marion C. Detloff, decedent's sister. The payment was in the amount of $18,632.49 which was the face amount of the policy plus accidental death benefits and accumulated and current dividends, minus a $1,888.96 loan against the policy. The $80,000 paid to Margaret by Travelers Life Insurance Company and the amounts paid to Joan De Vos and Mrs. Detloff, respectively, by the Prudential Insurance Company and the John Hancock Mutual Life Insurance Company were included in decedent's gross estate as reported on the estate tax return. Decedent's widow, Joan DeVos, on January 24, 1968, filed with the Probate Court of Oakland County, Michigan (hereinafter Probate Court) a petition for administration of decedent's estate, asking that Mr. Catlin be appointed administrator, and listing Mr. Catlin as attorney. On January 20, 1968, Mrs. DeVos had met with Mr. Catlin for 2-3/4 hours to discuss various matters concerning the probate of decedent's estate, and on January 22, 1968, Mr. Catlin had telephoned an agent of the Travelers Life Insurance Company. *170 In the petition for probate of decedent's estate the statement was made that decedent left an estate within Oakland County which included no real estate and a personal estate of "$50,000.00 upwards or thereabouts." On January 25, March 7, and April 18, 1968, Mr. Catlin contacted Mrs. DeVos but did not contact her again until July 16, 1969, when he wrote a letter to her requesting information about a land contract. Soon after Mr. Catlin's appointment as administrator of decedent's estate, Mr. Benjamin Pinkos, an employee of ROHT, and Mr. Whipple informed him that decedent owned 28,600 shares of ROHT stock at the date of his death. Mr. Catlin began to take an interest in the management of ROHT immediately after his appointment as administrator of decedent's estate, and Mr. Pinkos became the principal managing officer of ROHT. On February 28, 1967, decedent had executed an agreement with Garrett H. Mouw, Wendell G. Mouw, and Robert J. Walls, for the purchase of 90,000 shares of common stock of ROHT. Under the terms of this agreement, decedent was to pay 83-1/3 cents per share for the stock, which sum came to $25,000 to be paid to each seller. Decedent paid $5,000 to each of the three *171 sellers upon execution of the agreement and was to pay the remaining $20,000 to each of the sellers at the rate of $150 a month to each seller beginning April 15, 1967 and continuing until the entire purchase price was paid. Under the agreement decedent was to secure the unpaid balance by obtaining a $60,000 life insurance policy naming the sellers as beneficiaries under the policy to the extent of the unpaid balance of the purchase price of the stock. Decedent did in fact obtain a policy with Travelers Life Insurance Company in the face amount of $100,000 against which there was an indebtedness at the date of his death of $319.50. The proceeds of this policy were paid to the three sellers to the extent of their interest therein under the stock purchase agreement and the balance to the other beneficiary named therein, Mr. Pinkos. These proceeds were paid to the beneficiaries within 2 months after decedent's death through Mr. Catlin's efforts and at that time Mr. Catlin as administrator of decedent's estate took possession of the 90,000 shares of ROHT stock which was the subject of the stock purchase agreement. On May 8, 1968, Mr. Pinkos purchased 6,000 shares of ROHT common stock *172 from decedent's estate for $5,010. On May 27, 1968 and again on June 19, 1968, Mr. Catlin wrote to Margaret with respect to the opening of a safe-deposit box which was held jointly by Margaret and decedent. The box was opened by Mr. Catlin and Margaret on June 28, 1968, but Mr. Catlin did not at that time inquire of her with respect to her interest if any in decedent's estate under the divorce decree. On September 26, 1968, Mr. Mally offered to purchase 94,600 shares of ROHT stock from decedent's estate for $30,000. Mr. Catlin then consulted Mr. Warren DeCook, a certified public accountant, regarding the evaluation of Mr. Mally's offer. On November 15, 1968, Mr. Catlin rejected Mr. Mally's purchase offer since he believed the ROHT stock to be worth more than $30,000. On November 15, 1968, Mr. Catlin as administrator of decedent's estate petitioned the Probate Court for permission to employ Warren DeCook to assist in the preparation of the Federal estate tax return. The Probate Court on November 18, 1968, authorized the employment of Mr. DeCook. At that time both Mr. Catlin and Mr. DeCook were aware that a Federal estate tax return for decedent's estate would be necessary and *173 that the due date of the return was April 3, 1969. In November of 1968 Mr. Catlin told Mr. DeCook that decedent was divorced from Margaret, and Mr. DeCook requested that Mr. Catlin obtain a copy of the divorce decree and submit it to him. The preliminary notice, Form 704, which was due to be filed with the Internal Revenue Service with respect to decedent's estate on March 3, 1968, was not filed. In early April of 1969, Mr. Catlin was approached with respect to the sale of all of the ROHT stock held by decedent's estate. Negotiations ensued, and on April 24, 1969, the estate sold its ROHT stock for $58,000. In late March or early April 1969, Mr. Catlin filed an undated request with the Internal Revenue Service for an extension of 90 days for the filing of the Federal estate tax return for decedent's estate. In this request Mr. Catlin informed the Internal Revenue Service that the firm of DeCook and Nuyen had been retained to prepare the Federal estate tax return and requested that approval of the extension be mailed to that firm at their address in Detroit, Michigan. The Internal Revenue Service mailed to DeCook and Nuyen at the Detroit address of that firm under date of *174 April 9, 1969, a rejection of the requested extension of time for filing Federal estate tax return, giving as the reason: We have no record of your filing a preliminary notice (704) for the above estate. Form 704 has to be on file before an extension can be granted on Form 706. After receiving the rejection of the request for an extension shortly after April 9, 1969, Mr. DeCook decided that he would proceed to prepare and file an accurate return as soon as feasible. Mr. DeCook was aware at that time that there were certain items of information missing which were necessary to file an accurate return. Mr. DeCook did not advise Mr. Catlin to get some estate tax return in as soon as possible or that his failure to do this might result in a penalty but did advise him to attempt to obtain the information to file an accurate return as soon as possible. Mr. Catlin is an attorney at law practicing in the State of Michigan. He was admitted to practice in 1956 and has been engaged in the private practice of law since 1960. He is a general practitioner, specializing to some extent in municipal law. He does not prepare tax returns for clients but refers his clients to certified public accountants *175 for this service. In his entire practice, he has prepared only one Federal estate tax return. Mr. Catlin was aware when he requested an extension of time for filing the estate tax return, that the return was due to be filed on April 3, 1969. When the estate tax return was filed on March 24, 1970, it was accompanied by an affidavit by Mr. Catlin as administrator of decedent's estate, requesting that no penalty be assessed for the late filing of the estate tax return. In this affidavit, Mr. Catlin stated that when he was first appointed as administrator of decedent's estate, it did not appear to him that it would be necessary to file an estate tax return but that in November 1968 from information he then had, it appeared that it would be necessary to file such a return, but at that time he was of the opinion that no tax would be owing. He further stated that since April 1969, he had made continued investigation and inquiry which had uncovered information regarding payments of life insurance proceeds to various individuals. He recited the facts which he uncovered with respect to the policies called for in the divorce decree of Margaret and decedent not having been assigned to Margaret, *176 but $80,000 of insurance having been paid to Margaret, and the two policies referred to in the divorce decree having been paid to decedent's widow, Joan DeVos, and decedent's sister. He further recited the lack of cooperation of Joan DeVos with respect to information concerning the house she and decedent had been purchasing on a land contract and her denial of having received insurance proceeds. On April 1, 1970, Mr. Catlin filed an amended Federal estate tax return for decedent's estate because of a $10,000 claim of Marion C. Detloff against the estate and on August 26, 1970, filed a refund claim for decedent's estate based on the exclusion from the estate of the $80,000 insurance paid to Margaret. Preparation of the estate tax return had been completed on March 13, 1970 and immediately after that date Mr. Catlin petitioned the Probate Court for authority to pay the tax shown as due on the return. On March 24, 1970, the Probate Court authorized the payment and on that same day Mr. Catlin personally took the return together with a check for the tax to the downtown office of the Internal Revenue Service and filed the return and paid the tax and interest shown as owing thereon. *177 Respondent in his notice of deficiency made certain adjustments to the taxable estate as reported which are no longer in issue in the case having been disposed of by the parties and stated that The issue raised in your claim for refund requesting that the proceeds of certain life insurance policies in the total amount of $80,000.00 should be not includible in the gross estate has been given careful consideration and it has been determined that the decedent owned these policies at date of death and they are properly includible in the gross estate. OPINION Section 2042(2) provides that the value of the gross estate shall include amounts receivable by beneficiaries other than the executor as insurance under policies on the life of the decedent with respect to which the decedent possessed at the date of his death any incidents of ownership, exercisable either alone or in conjunction with any other person. Section 20.2042-1(c)(2), Estate Tax Regs., provides that the term, "incidents of ownership" has reference to the right of the insured to the economic benefits of the policy and includes *178 "the power to change the beneficiary." The facts here show that decedent had named his exwife, Margaret, as the beneficiary of the Travelers Life Insurance Company policy carried on his life by ROHT with the right in him to name the beneficiary but that he still retained a right to change the beneficiary at the date of his death. It is well settled that the right to change the beneficiary of an insurance policy is such an incident of ownership as to require the inclusion of the proceeds of the policy in the decedent's estate. Estate of Michael Collino,25 T.C. 1026, 1033 (1956); Piggott's Estate v. Commissioner,340 F. 2d 829, 834 (6th Cir. 1965), and cases there cited, affirming a Memorandum Opinion of this Court. Although petitioner does not in his brief specifically so state, he does apparently recognize this general rule, but argues that effectively, petitioner did not have the right to change the beneficiary of the policy paid to Margaret. Petitioner contends that the facts here show that decedent substituted the Travelers Life Insurance Company *179 policy for the policies provided for in the divorce decree and Margaret accepted that policy in lieu of those the divorce decree required to be assigned to her. Petitioner argues that it follows, under the facts of this case, that decedent should be considered as having assigned all rights in the Travelers policy to Margaret. Neither the facts shown in this record nor the rights of the parties under a divorce decree under the law of the State of Michigan support petitioner's contention. The evidence is clear that decedent retained at the date of his death the right to change the beneficiary of the Travelers policy insofar as his employer who carried the policy for his benefit was aware. The evidence does not support the conclusion that decedent had in fact parted with this right when he named Margaret the beneficiary of the Travelers policy. The evidence shows that the policy was delivered by Mr. Whipple to Margaret and she saw it was not either of the policies which were to be assigned to her under the requirements of the divorce decree but that she was named as the beneficiary in the policy. When Margaret spoke to decedent she was told that the policy delivered to her was a substitute *180 for the policies referred to in the divorce decree. Margaret then told decedent to get in touch with her lawyer and thereafter did nothing further to require decedent to assign to her the policies which he was required to assign to her under the divorce decree. In our view, this evidence does not support a finding that decedent intended to or did divest himself of the right to change the beneficiary on the Travelers policy. The fact that decedent merely named Margaret as beneficiary of the Travelers policy but did not make this action irrevocable or even irrevocable for 5 years and the lack of further discussion between Margaret and decedent concerning the policies which decedent was required by the divorce decree to assign to Margaret supports an inference that decedent intended to reserve his right to designate another beneficiary of the Travelers policy on his life owned by ROHT. Certainly no inference can properly be drawn from these facts that decedent intended to divest himself of the right to change the beneficiary of the Travelers policy. Section 25.131, Mich. Stat. Ann. (1974), *181 provides for the determination of wife's rights respecting life insurance or annuity contracts. [2] This statute which was enacted in 1939 provides that every decree of divorce shall determine all rights of the wife in and to the proceeds of any life insurance policies on the life of the husband and that unless otherwise ordered in the decree such policies or contracts shall, upon divorce, become payable to the estate of the husband or such beneficiary as he shall affirmatively designate. *182 In Starbuck v. City Bank and Trust Co.384 Mich. 295, 181 N.W. 2d 904, 906 (1970), the Court in discussing this provision of the Code stated: Prior to the addition in 1939 of the above-quoted portion of the statute to M.C.L.A. section 552.101, the wife was entitled to the proceeds of the policy when she remained the designated primary beneficiary after a divorce.Ancient Order of Hibernians v. Mahon (1922), 221 Mich. 213, 190 N.W. 696, and Guarantee Fund Life Association v. Willett (1927), 241 Mich. 132, 216 N.W. 369. The effect of the amendment, as stated in the title to the statute, in the judgment of divorce, and, in the statute itself, was to affect the interest of the wife in the insurance policy and thus cure the situation where a divorced wife could inadvertently receive the proceeds of a perhaps forgotten policy. "Inadvertently receive" should be stressed for the statute does not prohibit the husband or the divorce judgment itself from retaining or renaming the wife as the primary beneficiary. It simply requires affirmative action on the part of the court or husband to retain the divorced wife as the primary beneficiary *183 and thus eliminate what could be, and usually appears to be, the inadvertent payment of the life insurance proceeds to a divorced wife. It would therefore appear that by naming Margaret as the beneficiary after the divorce, decedent in no way relinguished any right he had to change the beneficiary in the Travelers policy. In Sturgis v. Sturgis,300 Mich. 438, 2 N.W. 2d 454 456 (1942), the Court held that the legal effect of a divorce decree cannot be altered by a subsequent agreement of the parties, but stands as an adjudication as to the parties rights unless amended or changed by the court. In our view, under the Michigan law, even if the evidence showed that it was the intent of the parties to substitute the name of Margaret as beneficiary on the Travelers policy for the assignment to her of the two policies named in the divorce decree, the attempted change of the provisions of the divorce decree would be ineffective since it was not approved by the court entering the divorce decree. Therefore, since decedent merely named Margaret as beneficiary of a life insurance *184 policy under which he had the right to designate the beneficiary, he retained at the date of his death the right to designate the beneficiary of the Travelers Life Insurance Company policy, the proceeds of which were paid to Margaret. This right is an incident of ownership which requires the $80,000 proceeds of that policy to be includable in decedent's estate. In the alternative petitioner contends that if he is not entitled to exclude from decedent's taxable estate the $80,000 paid to Margaret under the Travelers Life Insurance Company policy, then he should be able to deduct as a claim against the estate either (1) the $80,000 paid to Margaret under the policy, (2) the amounts paid to decedent's widow, Joan DeVos, and his sister, Mrs. Detloff, under the two policies which were required under the divorce decree to be assigned to Margaret, or (3) the $16,000 face amount of these two policies. We agree with petitioner with respect to the right of the estate to deduct the proceeds of the two policies required by the divorce decree to be assigned to Margaret as a claim against the estate. *185 Section 2053(a)(4)[3] provides that there shall be deducted from the gross estate amounts of any indebtedness in respect of property where the value of decedent's interest therein, undiminished by such indebtedness, is included in the value of the gross estate. Decedent's gross estate as reported on the estate tax return included the $12,177 paid to Joan DeVos by the Prudential Insurance Company under one of the insurance policies which the divorce decree required to be assigned to Margaret, and the $18,632.49 which was paid by the John Hancock Mutual Insurance Company to Mrs. Detloff on the other policy which was required by the divorce decree to be assigned to Margaret. *186 Petitioner does not contend that the proceeds of these policies are not properly includable in the gross estate but contends that because these proceeds are includable in the gross estate the amount thereof is deductible under the provisions of section 2053(a)(4). Since petitioner had not, in fact, assigned the policies to Margaret in accordance with the requirements of the divorce decree, in our view, the amounts paid under these policies were properly included in decedent's gross estate on the estate tax return. See Estate of Chester H. Bowers,23 T.C. 911 (1955). However, as was pointed out in the Bowers case at 920, under the provisions of a property settlement agreement incident to a divorce, an indebtedness might arise under state law against a decedent's estate for the amount of life insurance he was required to keep in force, had he not kept such life insurance in force. If such an obligation exists under state law, it represents an indebtedness within the meaning of section 2053(a)(4) with respect to property included in the gross estate where the proceeds of *187 the life insurance policies actually maintained by the decedent have been included in the estate. In the Bowers case we held that such an indebtedness did arise under California law. In the very recent case, Estate of William E. Robinson,63 T.C. 717 (1975), we followed the Bowers case and held that proceeds of insurance policies which a decedent was required under a divorce decree to keep in effect for his ex-wife created a deductible indebtedness against the estate since under the Nevada law there involved, the amount of the insurance which the decedent was required to keep in force would have been an indebtedness against the estate had he not kept the policies in force. In so holding we pointed out that a similar conclusion had been reached in Gray v. United States, an unreported case ( C.D. Cal. 1974, 34 AFTR 2d par. 147,937, 74-2 USTC par. 13,019). The Gray case which also involved California law relied, in reaching its conclusion, on the Bowers case. In our view of the Michigan law, there was an indebtedness of decedent's estate to Margaret in the amount of the life insurance policies which the divorce decree required decedent *188 to assign to Margaret. In Morris v. Morris,365 Mich. 365, 112 N.W. 2d 500 (1961), the Supreme Court of Michigan construed a provision of a divorce decree that a husband should maintain in full force and effect certain life insurance policies payable to his ex-wife and was restrained and enjoined from changing the beneficiary of such policy. After the death of the husband his present wife petitioned for a judicial determination that the insurance proceeds, after payment of alimony arrears, belonged to the estate. The Michigan Supreme Court quoted with approval an order of the lower court that the insurance policies were not intended as security for the payment of alimony "but that the same were intended to vest in the plaintiff an interest in said policies of insurance to the extent and on the terms and conditions therein provided and said policies of life insurance having matured on the death of the defendant during the lifetime of the plaintiff, neither the decedent's estate nor the petitioner * * * have any interest in the proceeds thereof." The Supreme Court went on to add that the requirements of the decree vested the ex-wife with "the ordinary property rights *189 of correspondingly named life beneficiaries." It appears to us that under the holding of Morris v. Morris,supra, here the divorce decree vested Margaret with all property rights to the two insurance policies that were required by the decree to be assigned to her, and therefore she had an enforceable indebtedness in respect of property which was included in the value of decedent's gross estate. Respondent argues that if under the facts here any amount is deductible from decedent's gross estate as an indebtedness to Margaret it is only the small amount of alimony arrearages plus the alimony due for the balance of the 5-year period, a total of $12,075. This is the same argument rejected by the Michigan Supreme Court in Morris v. Morris,supra. Here as in that case, the provision for insurance was a separate provision from that for alimony. It is the right vested in Margaret by the divorce decree to have the policies assigned to her that gives rise to the indebtedness of the estate to Margaret for the proceeds of the policies, not merely the $16,000 face amount of the policies had decedent's death not been accidental. We hold that decedent's *190 estate is entitled to deduct $30,809.49 as an indebtedness to Margaret with respect to property included in the gross estate. Respondent finally argues that Margaret made no claim against the estate, and time for filing a claim has expired and therefore under our holding in Estate of Frank G. Hagmann,60 T.C. 465 (1973), the estate should not be entitled to the deduction. There is no merit to this argument since Margaret's claim was in substance paid by her receipt of the $80,000 proceeds of the Travelers Life Insurance Company policy. Although we agreed with respondent that decedent's naming Margaret as beneficiary of this policy without releasing his right to change the beneficiary did not cause the $80,000 to be excluded from decedent's estate or be an indebtedness of the estate to Margaret, we do not agree that this attempted substitution was not sufficient to be in effect a payment by the estate of Margaret's smaller claim against the estate. The final issue is whether petitioner has shown that the late filing of the estate tax return was due to reasonable cause and not to willful neglect so that the addition to tax for failure to timely file the return *191 is inapplicable. The evidence shows that after requesting and failing to receive a 90-day extension of time for filing the estate tax return, the administrator did not file a return until almost one year after the date the return was due to be filed, even though he was aware of the due date of the return. The record here shows that 4-1/2 months prior to the due date of the return the administrator of decedent's estate knew that the value of the estate was sufficient to require the filing of an estate tax return. Although the administrator testified at some length in this case as to problems encountered in determining the assets of the estate in order to file an accurate estate tax return, a review of this testimony discloses nothing which we consider to show that with reasonable diligence the administrator could not have ascertained with enough degree of accuracy the assets of the estate to file an estate tax return by the due date thereof, or certainly within a very short period of time after receiving the rejection of his request for an extension of time to file the return. A certified public accountant was retained by the administrator to prepare the estate tax return for decedent's *192 estate 4-1/2 months before the due date of the return. This accountant testified at some length. We have considered his testimony but conclude that nothing therein shows reasonable cause for the failure to file the estate tax return on its due date or within a very short period of time after receiving the denial of the requested extension of 90 days for filing the return. The record does not even show that after receiving the rejection of this requested extension that the cause of the rejection was remedied and an attempt again made to obtain an extension for a reasonable length of time for filing the return. We have also considered the testimony of the lawyer who testified as to the reasonableness of petitioner's late filing of the estate tax return and conclude that nothing contained in his testimony supports a finding that the late filing was due to reasonable cause. The record is clear that the administrator knew by April 1968 of the $100,000 Travelers Life Insurance Company policy which paid the balance due on the stock purchase agreement which decedent had with three individuals and knew about other stock in ROHT owned by decedent. It is also apparent that he had fair knowledge *193 of the value of that stock before the due date of the estate tax return. It is also clear that well before the due date of the return, the administrator knew of Margaret's divorce from decedent and could easily have obtained a copy of the divorce decree and become alerted to the two insurance policies mentioned in that decree. The record also shows that the administrator, shortly after his appointment, began to participate in the affairs of ROHT and that he was informed by Mr. Whipple, who was the person who delivered the Travelers Life Insurance Company checks to Margaret, about decedent's ownership of 28,600 shares of stock in ROHT. It would seem logical that participating in the management of ROHT, the administrator could easily have ascertained what insurance, if any, the company had carried for decedent. Reasonable cause for failure to timely file a tax return has been defined to be the exercise of ordinary business care and prudence. Estate of FrankDuttenhofer,49 T.C. 200, 204 (1967), affirmed per curiam 410 F. 2d 302 (6th Cir. 1969). As we pointed *194 out in the Duttenhofer case, an individual does not act as an ordinarily intelligent and prudent businessman "by blindly acquiescing in all" of an attorney's "decisions and thus giving him effective control of administering the estate, whereas this responsibility was basically" his own. The administrator here was a lawyer who had knowledge of the due date of the estate tax return as well as knowledge of the fact that his request for an extension of time to file the return had been denied. It was his duty to file the return as soon as reasonably feasible after the denial of the request for extension. The fact that he employed an accountant to actually prepare the return does not justify his failure to see that a timely return was filed. As we pointed out in William H. Maudlin,60 T.C. 749, 762 (1973), the law is well settled that a taxpayer cannot avoid his obligation to file a timely return by delegating to another the responsibility for preparing and filing his return. The fact that his obligation to file a timely return cannot be delegated to another should be particularly apparent to a lawyer who should have a thorough understanding of his own legal responsibility. *195 See Estate of William T. Mayer,43 T.C. 403 (1964), affirmed per curiam 351 F. 2d 617 (2d Cir. 1965). The cases relied on by petitioner in support of his contention that his reliance on an accountant to file the estate tax return constitutes reasonable cause are all distinguishable on their facts from the instant case. This record does not show that petitioner ever received definite advice from the accountant that the return could be filed nearly one year after its due date without incurring the addition to tax for late filing. See R. A. Bryan,32 T.C. 104, 133 (1959), affirmed on this issue 281 F. 2d 238 (4th Cir. 1960). The record here shows that well before the due date of the return petitioner knew the estate tax return was due and its due date. See Paula Construction Co.,58 T.C. 1055, 1060 (1972). Here petitioner had not supplied the accountant with all the necessary information prior to the due date of the return and requested him to prepare a proper return from that information as had the taxpayer in Haywood Lumber and Mining Co. v. Commissioner,178 F. 2d 769 (2d Cir. 1950), *196 modifying 12 T.C. 735 in which the Second Circuit held that such reliance on an expert was reasonable cause for late filing of a personal holding company tax return. This case is likewise distinguishable from In re Fisk's Estate,203 F. 2d 358 (6th Cir. 1953), reversing a Memorandum Opinion of this Court, relied on by petitioner. In that case the Second Circuit held that reliance by the executor on an attorney who apparently thought that the date of mailing the return would be considered the date of filing was reasonable cause for the return being filed one day late. On the facts here, we sustain respondent in his addition to tax for failure to timely file the estate tax return. Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code of 1954, unless otherwise noted.↩
2. Mich. Stat. Ann. Section 25.131 (1974) Provision in lieu of dower; inclusion in decree, effect on property claims; determination of wife's rights respecting life insurance or annuity contracts, company's liability discharged. Sec. 1. When any decree of divorce is hereafter granted in any of the courts of this state, it shall be the duty of the court granting such decree to include in it a provision in lieu of the dower of the wife in the property of the husband, and such provision shall be in full satisfaction of all claims that the wife may have in any property which the husband owns or may thereafter own, or in which he may have any interest. Hereafter every decree of divorce shall determine all rights of the wife in and to the proceeds of any policy or contract of life insurance, endowment or annuity upon the life of the husband in which she was named or designated as beneficiary, or to which she became entitled by assignment or change of beneficiary during the marriage or in anticipation thereof, whether such contract or policy was heretofore or shall hereafter be written or become effective, and unless otherwise ordered in said decree such policy or contract shall thereupon become and be payable to the estate of the husband or to such named beneficiary as he shall affirmatively designate: Provided, That the company issuing such policy or contract shall be discharged of all liability thereon by payment of its proceeds in accordance with its terms, unless before such payment the company shall have written notice, by or on behalf of the insured or the estate of the insured or one of the heirs of the insured, or any other person having an interest in such policy or contract of a claim thereunder and the aforesaid divorce.↩
3. SEC. 2053. EXPENSES, INDEBTEDNESS, AND TAXES. (a) General Rule.--For purposes of the tax imposed by section 2001, the value of the taxable estate shall be determined by deducting from the value of the gross estate such amounts-- * * * (4) for unpaid mortgages on, or any indebtedness in respect of, property where the value of the decedent's interest therein, undiminished by such mortgage or indebtedness, is included in the value of the gross estate, as are allowable by the laws of the jurisdiction, whether within or without the United States, under which the estate is being administered.↩