WILLIAM B. AKERS and JOANN AKERS, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Akers v. Commissioner
Docket No. 14435-81.
United States Tax Court
T.C. Memo 1984-490; 1984 Tax Ct. Memo LEXIS 183; 48 T.C.M. (CCH) 1113; T.C.M. (RIA) 84490; September 12, 1984. Mark H. Westlake and Ervin M. Entrekin, for the petitioners. Robert B. Nadler and John L. Hopkins, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' income taxes in the amounts of $79,755.22, $62,088.90, and $46,863.58 for the years 1977, 1978, and 1979, respectively. Some of the issues raised by the pleadings have been disposed of by agreement of the parties, leaving for our decision only the fair market value on June 1, 1977, of a scenic easement that petitioners donated over 1,342.66 acres of land in Cheatham County, Tennessee, to the Tennessee Conservation League. [1] The parties agree that to the extent this easement had a fair market value, its grant entitles petitioners to a charitable deduction under section 170(a)(1). [2]
*186 FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. William B. Akers and JoAnn D. Akers (petitioners), husband and wife, who resided in Nashville, Tennessee, at the time of the filing of their petition in this case, filed joint Federal income tax returns for the calendar years 1977, 1978, and 1979 with the director, Memphis Service Center, Memphis, Tennessee. For the calendar year 1977, petitioners filed an amended return. On June 1, 1977, petitioners granted a scenic easement over 1,342.66 acres of land located in Cheatham County, Tennessee, to the Tennessee Conservation League (TCL) which qualifies as a public charity. [3] The easement was granted for the scenic enjoyment of the public as well as the conservation and protection of the natural environmental systems on the property. The easement, which is for a period of 30 years and approximately 1 month, will terminate on June 30, 2007. At that time the property will revert unencumbered to petitioners. The following covenants and restrictions are contained in the instrument conveying the easement: 1. There *187 shall be no more than one family dwelling unit for each two hundred (200) acres of land. 2. No structures of any kind shall be placed or erected except such structures as shall be approved by the Tennessee Conservation League as being consistent with the purpose of establishing an easement for the scenic enjoyment of the public and as being consistent with the protection of and preservation of the natural environmental systems within the property described in Exhibit "A". 3. There shall be no dumping of ashes, trash, junk, rubbish, sawdust, garbage or any other unsightly, unsanitary or offensive material on or within the said property. 4. There shall be no structural changes or additions to any existing structures on said property as of the date of this conveyance unless and until an application therefor has been submitted to the Tennessee Conservation League and written approval has been obtained from the Tennessee Conservation League which written approval may be evidenced by a written instrument executed by its duly authorized executive director. 5. There shall be no private drives constructed upon said property after the date of this conveyance until and unless written *188 application therefor has been made to the Tennessee Conservation League and written approval obtained from the said Tennessee Conservation League as evidenced by written instrument executed by its duly authorized executive director. 6. All plantings upon the property shall be approved by the Tennessee Conservation League as evidenced by a written instrument executed by its duly authorized executive director and all plaintings shall be for the purpose of preserving the natural environmental system within the property. It is understood and agreed that Grantor reserves the right to plant flowers, vegetables, berries, fruit trees and farm crops characteristic of the region and those that might be suitable for experimental purposes in order to determine the plant life that might be accommodated by the natural environmental system of the property, provided that such plantings do not substantially alter the natural environmental systems. 7. There shall be no excavation or topographic changes that would cause or tend to create a material change in the general topography of the landscape which shall be maintained unless and until written approval has been obtained from the Tennessee *189 Conservation League through its duly authorized executive director requesting or consenting to any such change. 8. No trees, shrubs, flowers or undergrowth shall be removed, cut, or destroyed except for reasons of sanitation and disease control and except such cutting or removal as shall be done in accordance with a plan consistent with the preservation of the environmental system of the property and heretofore filed with the Tennessee Conservation League and approved by its duly authorized executive director. 9. There shall be no use of the property if such use, in the opinion of the Tennessee Conservation League or its duly authorized executive director, will or does materially alter the landscape or other natural attractive features of said property, other than those as provided for herein which shall be done only with the written consent of the Tennessee Conservation League through its duly authorized executive director. 10. There shall be reserved unto the owner, his heirs, representatives and assigns, the right to maintain all of the buildings now existing and if any or all of them shall be destroyed or damaged by fire, storm or other causalty to restore same in conformity *190 with the plans to be submitted to and approved by the Tennessee Conservation League, acting through its duly authorized executive director. Nothing in this instrument shall be construed to affect the rights of the owner, his heirs, representatives and assigns to construct wells, cisterns, cellars and septic systems necessary to the maintenance of the structures presently existing upon the property or such structures as may hereafter be approved for upon the property by the Tennessee Conservation League, acting through its duly authorized executive director. 11. The Tennessee Conservation League, acting by and through its executive director joins in the execution of this instrument for the purpose of acknowledging that it shall hold the above described easements exclusively for conservation purposes and that the Tennessee Conservation League will actively carry out the conservation purposes of protecting and preserving the property described herein for the people of Tennessee. Provided, however, there shall be no grant of right of entry to the public whether limited or general and only those persons may enter the property as have the permission of the owner, his heirs, representatives *191 and assigns. This instruments grants permission for entry upon the property for the executive director of the Tennessee Conservation League and his agents and employees for the purpose of enforcement of the restrictive covenants and easements granted by this instrument. 12. The Tennessee Conservation League shall enforce these restrictions acting through its executive director. Any failure to enforce these restrictions because of any violation shall not be deemed a waiver of such right as to any subsequent or other violations, such right being a continuing one. 13. Whenever this instrument calls for approval by the Tennessee Conservation League, it is understood and agreed that such approval is to be given by the executive director of the Tennessee Conservation League or the equivalent person serving in such capacity for the Tennessee Conservation League or such successors or assigns which likewise qualify as public charities within the meaning of Section 170(b)(1)(A) of the Internal Revenue Code of 1954, as amended. The scenic easement was conveyed over petitioners' property which consists of (1) 1,261.15 acres in a tract referred to as the Treanor *192 Tract, which is located in the southwest corner of Cheatham County, Tennessee; and (2) 31 tracts which adjoin the Treanor Tract and total approximately 81.51 acres in a development known as the Interstate West Ranchettes Subdivision (Ranchettes). There is no commercial development in the area of the property. Cheatham County offers recreational activities such as hunting, boating, fishing and swimming. Petitioners' property in the Treanor Tract and the Ranchettes has no access to a public water supply or public sewerage. Petitioners' property is approximately 25 miles east of Nashville, Tennessee, and is located 4 to 5 miles from I-40, which is the nearest interstate highway. The Treanor Tract is wooded except for approximately 140 acres of land that is suitable for farming. Generally the property consists of heavily wooded ridges and hollows with some creek bottom farmland. No marketable timber exists on the tract. Marketable timber in this area requires approximately 30 to 45 years between cuttings and the timber on petitioners' property was cut shortly before petitioners purchased it in 1965. The road throughout the Treanor Tract is an unpaved road that is not county maintained. *193 The Treanor Tract is improved by two vacation homes. One is used by petitioners and the other is used by Mr. Aker's brother, J. Clark Akers, III. Each vacation home is adjacent to a dam and a lake. The subdivision of the Ranchettes into 600 lots began in 1963 and by 1977 all but 6 lots had been sold. In 1977, only 30 to 40 of the 600 lots that had been sold had houses built on them. Petitioners' lots in this development are wooded and are generally level or gently sloping to the rear and all lots face county maintained roads. The 31 tracts which petitioners own in the Ranchettes range in size from 2 acres to 5.90 acres. The average size of these tracts is 2.63 acres. Petitioners purchased the 1,261.15 acres of the Treanor Tract in 1965 for $125,000. From 1970 through early 1977, petitioners acquired from various grantors the 31 separate tracts in the Ranchettes. The following table shows the acquisitions by petitioners of lots in the Ranchettes from 1970 through 1976: Date
Date of
Consideration
Lots
Contract
Passed
Cost
51, 146
2/20/70
2/25/70
$1,990
45, 46, 47
5/24/72
5/24/72
4,500
147
9/29/72
9/29/72
1,500
150, 151, 152, 161
8/72
10/2/72
5,000
148
12/5/72
12/5/72
1,500
268, 269, 270, 271, 272
8/10/72
8/10/72
7,000
299
8/72
10/2/73
1,500
149
7/74
12/9/74
2,500
162
5/74
12/9/74
1,500
313
1/21/75
1/21/75
1,500
54
4/10/75
9/5/75
2,750
153
10/29/73
9/5/75
1,700
48
8/9/76
11/22/76
2,500
56
10/19/76
11/22/76
3,000
42, 43
5/20/76
3/8/77
4,500
52, 53
3/12/76
11/22/76
9,000
*194 The following table shows petitioners' acquisitions in the Ranchettes in 1977, the acreage of each lot and the cost per acre: Date
Date of
Consideration
Cost
Lots
Contract
Passed
Acreage
Cost
Per Acre
137
1/13/77
1/13/77
5.9
$2,000
$338.98
138
1/14/77
3/8/77
3.5
1,800
514.29
55
3/8/77
3/8/77
2.67
1,333
499.25
Both petitioners and J. Clark Akers, III, have an A-frame vacation home on the Treanor Tract. Petitioners' vacation home overlooks a 1-1/2 acre lake. Two acres of grass surround the house. The access to the house is by means of a short graveled driveway which is approximately 300 feet from the main road. There is a boat dock on the shore of the lake. Petitioners' house was built in 1969 and contains 1,434 square feet on the main floor and 270 square feet in the loft. There are two bedrooms with adjoining ceramic tile baths, a kitchen-living room with a 10-foot stone fireplace and a cathedral wood beam ceiling. The kitchen has a built-in oven, electric range, dishwasher and numerous kitchen cabinets of top quality wood. The bedrooms and living room have parquet floors, while the kitchen has viny inlaid linoleum. *195 The entire house has wood paneling. There is a metal spiral stairway to the loft which contains two built-in beds. There are four screened wooden floor porches across the north and south sides of the dwelling as well as a usable basement with concrete floor and an oil furnace. The house has central heat but no air-conditioning. The exterior of the house has rustic wood frame sides and a metal roof. When petitioners' A-frame dwelling was built, a dam impounding the adjoining lake was built with approximately 60 yards of reinforced concrete. J. Clark Akers, III, built his A-frame dwelling in a separate portion of the subject property in 1973. His house contains approximately 1,092 square feet [4] on the main floor and 168 square feet in the loft. His private lake is about 4 acres and a 1-acre grass area surrounds the house. The access to the house is by means of a long graveled driveway approximately 2,500 feet off the main road. The house has two bedrooms with adjoining baths, a kitchen-living room and a loft. The living room has a wood beamed cathedral ceiling and a metal freestanding fireplace. There is no basement, but a storage room is accessible from the outside. There *196 is a modern kitchen, central oil heating and central electric air-conditioning. The floors are carpeted in the bedrooms, vinyl is in the kitchen, hardwood is in the living room and ceramic tile is in the baths. The exterior of the house is rustic wood frame with metal and composition siding shingle. Both houses have wells with electric pumps and septic tanks. The subject property, including the Treanor Tract, the Ranchettes and the vacation homes, was appraised for real estate tax purposes by the Cheatham County Tax Office in 1969 and 1979 in accordance with the policy of the county to appraise real property every 10 years. The value of the property in 1969 according to the Cheatham County Tax Office appraisal was $196,480. After 1973 this valuation was updated to include the vacation home of J. Clark Akers, III. The 1979 appraisal of the subject property by the Cheatham County Tax Office showed its value to be $497,535. The following schedule lists certain sales of properties in Cheatham County, except as otherwise indicated, the size of each tract, the date of *197 the sale, the total sales price and the price per acre: Sale
Acres
Date of
Total
Sales Price
No.
in Tract
Sale
Sales Price
Per Acre
1
63    1/27/77
$42,000.00
$666.67
(Dickson County)
2
65.85 1/10/77
52,000.00
789.67
(Dickson County)
3
72    8/15/77
60,000.00
833.33
(Williamson County)
4
5    5/17/77
3,500.00
700.00
(Williamson County)
5
40.229
5/25/77
40,229.00
1,000.00
(Williamson County)
6
6.75 7/21/77
11,125.00
1,648.00
7
13.85 10/8/77
18,000.00
1,299.64
8
10.02 9/8/77
10,020.00
1,000.00
9
15.14 10/26/76
12,750.00
842.14
10
10.10 1/10/77
9,500.00
940.59
11
9.5  5/31/77
12,500.00
1,315.79
12
132    12/16/77
72,000.00
545.45
13
9.22 8/16/77
5,000.00
542.29
14
1,437.70 12/20/73
431,310.00
300.00
15
1,006.77 2/20/79
650,000.00
646.00
16
2,200    12/72
398,200.00
181.00
17
243    4/75
40,095.00
165.00
18
109    12/77
34,989.00
321.00
19
165    8/75
17,490.00
106.00
20
117    6/75
14,976.00
128.00
21
148    9/76
34,928.00
236.00
22
44    3/78
22,000.00
500.00
23
64    8/76
30,912.00
483.00
24
44.4  9/78
13,808.40
311.00
25
91.25 2/78
30,021.25
329.00
26
99.8  6/78
27,544.80
276.00
27
134.48 3/79
80,688.00
600.00
(Williamson County)
28
178    7/76
89,000.00
500.00
*198 The current highest and best use of the subject property, both before and after the gift of the easement, was for secluded recreational retreats. It would have been feasible before the granting of the easement to have divided the Treanor Tract into 24 separate tracts ranging in size from 13 to 137 acres, with each tract having some access to a road. [5] After the gift of the easement, it would not have been feasible to sell the total subject property in more than six tracts for use as retreats because the restriction permitted building of only six residences on the property. The deduction taken by petitioners on their Federal tax return for 1977 as result of the conveyance of the scenic easement to the TCL was limited to $110,648 with the remainder carried over to tax years *199 1978 and 1979. On their 1978 and 1979 Federal income tax returns, petitioners claimed charitable deductions in the amounts of $103,240 and $68,536, respectively, from carryovers relating to the scenic easement given in 1977 to the TCL. Respondent, in his notice of deficiency, disallowed the $110,648, $103,240 and $68,536 charitable deductions claimed by petitioners on their Federal income tax returns for 1977, 1978 and 1979, respectively, explaining that the deductions were not allowable because petitioners failed to establish the fair market value of the restrictive easement granted to the TCL of Nashville, Tennessee. OPINION Section 1.170A-1(c)(1), [6] Income Tax Regs., provides that when a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the date contributed reduced when necessary as provided in section 170(e)(1). The fair market value of property is defined in section 1.170A-1(c)(2), Income Tax Regs., as "the price at which the property would change hands between a *200 willing buyer and a willing seller, neither being under any compulsion to buy or sell and both having a reasonable knowledge of relevant facts." According to section 170(f)(3)(A), [7] no deduction is allowed for a charitable contribution of less than the taxpayer's entire interest in property. An exception is provided in section 170(f)(3)(B)(iii) and (C)(iii), [8] in the case of the contribution of an easement with respect to real property granted to a qualified organization exclusively for the protection of natural environmental systems. [9]
*201 Respondent takes the position that the pre-easement fair market value of petitioners' land was the same as the post-easement fair market value of petitioners' land. The easement, respondent asserts, did not diminish the value of the property because the easement imposed no restrictions on the highest and best use of petitioners' land as a pleasure retreat before and after the granting of the easement. Thus, respondent argues, the fair market value of the easement donated to the TCL by petitioners in 1977 was zero. Petitioners take the position that the fair market value of the scenic easement was $789,000, which they contend is the difference between the pre-easement value of petitioners' land ($1,342,000) and the post-easement value of petitioners' land ($553,000). Thus, petitioners claim they are entitled to a charitable deduction in the amount of $789,000. The fair market value of property at any given date is a factual question and requires a consideration and weighing of all the relevant evidence in the record. Mauldin v. Commissioner,60 T.C. 749, 759 (1973); *202 Kaplan v. Commissioner,43 T.C. 663, 665 (1965). Both parties agree that in valuing a scenic easement a "before and after approach" may be used. [10] This procedure entails measuring the difference between the fair market value of petitioners' property immediately before the scenic easement was granted and the fair market value of the property immediately after the scenic easement was granted. Both parties presented expert testimony of real estate appraisers to support their valuations of the scenic easement as of June 1, 1977. All three experts prepared written reports of their appraisals. Petitioners' expert witness, Benjamin B. Doubleday, Jr., of Nashville, Tennessee, is a real estate broker and owner of Doubleday & Co., a real estate firm located in Nashville, Tennessee. Mr. Doubleday inspected and appraised the subject property from January 1, 1978, to March 31, 1978, in response to a request from petitioners' attorney to appraise the fair market value of the subject property *203 as of June 1, 1977. Mr. Doubleday concluded in a formal written report that the easement reduced the fair market value of petitioners' property by the amount of $772,000. This figure approximates the difference between the amount Mr. Doubleday concluded was the pre-easement value for the subject property, $1,342,000 (rounded), and the post-easement value of the property, $585,700 (rounded). One of respondent's expert witnesses, Paul Johnson, was licensed as a real estate broker by the State of Georgia in 1975.At the time of his appraisal of the subject property, he was employed by the Internal Revenue Service in Atlanta, Georgia, as a real estate appraiser. Mr. Johnson inspected the subject property on June 25, 1981, and supported his appraisal with a formal written report dated July 31, 1981. Mr. Johnson concluded that the pre-easement value for the property, which he calculated to be $668,500, remained the same after petitioners' grant of the scenic easement to the TCL. He concluded that the reduction in fair market value of petitioners' property as a result of their conveyance of the scenic easement to the TCL was zero. Respondent's second expert witness, Dennis H. Donovan, *204 was a real estate appraiser for Norman Hall & Associates, a real estate appraisal and consulting firm located in Nashville, Tennessee. He had worked as a real estate appraiser for the Tennessee Valley Authority from 1963 to 1982. Mr. Donovan inspected the subject property on June 16, 1983, and reported his findings in a formal written appraisal dated June 20, 1983. Therein he concluded that the fair market value of the subject property as a result of the conveyance of the scenic easement to the TCL was reduced in the amount of $114,000. This figure approximates the difference between the pre-easement value for the subject property which he calculated to be $694,000 (rounded) and the post-easement value which he calculated to be $580,000 (rounded). We have carefully considered the testimony, including the written reports, of each of the three experts. We put little weight on Mr. Doubleday's testimony since, in our view, neither the comparables which he used to compute the pre-easement value of the property nor the comparables he used to compute the post-easement value of the property were reasonably indicative of the value of the property in the subject tract. Mr. Doubleday *205 used the properties, which we have listed in our findings as sales nos. 1 through 13, to compute the pre-easement value of the Treanor Tract. Most of these tracts are smaller than the tracts into which Mr. Doubleday testified the Treanor Tract might feasibly be divided without expenditure of large sums for development of the property. At one point, Mr. Doubleday stated that solely because of the difference in size a 200-acre tract would sell per acre for approximately 70 percent of the per acre price of a 132-acre tract. While in our view the evidence in this record does not support such a conclusion, it clearly appears to us that the tracts used by Mr. Doubleday as comparative of the pre-easement value of the property have not been shown to be comparable to the Treanor Tract or the smaller tracts into which it might feasible by divided without large expenditures to subdivide the tract. In fact, the record shows that some of the tracts used by Mr. Doubleday as pre-easement comparatives were located in areas adjacent to residential property and that some were feasible for subdivision development with roadways and other improvements. Mr. Doubleday did not consider the highest and best *206 use of the Treanor Tract to be for subdivision into 5-acre-or-less lots which would have required expenditures for roads and other improvements. However, it appears that certain of his comparables were in such tracts. The subdivision of the Ranchettes was done in 1963, and it required 16 years for sale of all but six of the lots. This is an indication that certainly as of June 1, 1977, the Treanor Tract would not have been suitable for a similar subdivision, although the possibility existed of such future subdivision of the property. Also, the sales that we have listed as Nos. 17 through 28 show other properties in Cheatham County selling in 1976, 1977 and 1978 at prices in the range of under $300 to around $500 an acre. Mr. Doubledy gave no explanation of why he did not use any of these properties as comparatives. We conclude that Mr. Doubleday picked as comparatives for the pre-easement value of the Treanor Tract properties which sold at relatively high prices without showing their comparability to the Treanor Tract. Mr. Doubleday, for the post-easement value of the property, used isolated tracts of land which he considered to be sold for possible use of growth of timber. In *207 our view, this does not give consideration to the highest and best post-easement use of the Treanor Tract. For the value of the Ranchettes, Mr. Doubleday put primary weight on one sale in 1977 of a small 1.8 acre lot at $2,500 an acre. The record shows that no other lot in the Ranchettes sold for an amount approaching that price and that the lots purchased by petitioners themselves in the Ranchettes in 1977, which insofar as this record shows were purchased in arm's-length transactions, were bought for $339 to $514 an acre. Based on our analysis of the record, we do not consider Mr. Doubleday's valuation to be acceptable in determining the value of the easement granted by petitioners. Respondent's witness, Mr. Johnson, used a different approach to valuation than either Mr. Doubleday or respondent's other witness, Mr. Donovan. Mr. Johnson concluded that the value before and after the easement was the same. He valued the Treanor Tract by applying comparables for woodland property to the wooded acres of the Treanor Tract, comparables of pastureland for valuing the pastureland in the Treanor Tract, comparables of cropland for valuing the cropland in that tract and comparables in *208 the Ranchettes area for valuing the 81.51 acres of Ranchettes land. [11] To the $585,000 land value arrived at by Mr. Johnson, he added $83,500 as the fair market value of improvements to determine a total fair market value prior to the granting of the easement of $668,500. Mr. Johnson's opinion was that the value of the land would not be affected by the granting of the easement. Although Mr. Johnson's approach differed from Mr. Donovan's approach, the amount he arrived at as the pre-easement value of the property appears to us to be reasonable. However, we cannot accept Mr. Johnson's opinion that the restrictions put on the land by the easement would in nor way reduce its value. Mr. Johnson reached this conclusion by confusing the post-easement value of the land to Mr. Akers with the fair market value of the land to a willing buyer and seller, both being knowledgeable. Mr. Akers frankly admitted that he had no intention of selling the land but intended to keep it for himself and his children. The value of the land to Mr. Akers is not necessarily its fair market value. Considering the testimony of the other two experts, we conclude from the record as a whole that a willing buyer *209 of the land after the granting of the easement would pay less for it than he would have paid before the granting of the easement, and a willing seller would sell it for less after it was encumbered by the easement. The restrictions clearly affect any potential use of the land for subdivision into small lots in the event the area became appropriate for such subdivision before the expiration of the easement's 30-year life. *210 We are persuaded from Mr. Donovan's valuation of the property before and after the granting of the easement that his determinations reasonably reflect the respective values. Mr. Donovan, in his pre-easement valuation of the Treanor Tract, gave primary weight to the sales of two tracts (nos. 14 and 15 set forth in our findings), one of which was a little over 1,000 acres and the other a little over 1,400 acres. These tracts are reasonably comparable to the Treanor Tract before the granting of the easement. Mr. Donovan justified the use of these larger tracts as comparables (although he considered the highest and best use of the property to be in tracts of 50 to 200 acres for use as vacation retreats) because of the each with which they could be divided into smaller tracts. He also supported his valation with sales of a number of smaller tracts at relatively the same per acre price as the larger tracts. Form our review of the various sales placed in the record, we conclude that Mr. Donovan's estimate of the pre-easement value of the Treanor Tract is a reasonable one. We also note that his pre-easement value of the property is very close to that of Mr. Johnson's who also considered *211 the sales prices of various properties in the area which had been sold around June 1, 1977, with adjustments for earlier or later dates. We likewise consider Mr. Donovan's valuation of the improvements on the property to be reasonable. Mr. Donovan valued the 81.51 acres owned by petitioners in the Ranchettes at $1,000 per acre. In our view, this valuation is on the high side, considering the fact that petitioners themselves had purchased lots in 1977 in the Ranchettes for an average of less than half that price per acre. However, Mr. Donovan, in making his estimate, considered the sale in March 1977 of a 1.8 acre lot for $2,500 an acre along with other sales of lots in the Ranchettes. We do not consider the isolated sale at $2,500 per acre to be indicative of market value when the experts were unable to explain why this price was so much higher than the price at which any other Ranchettes property was sold. However, valuation is not an exact science and since we consider Mr. Donovan's overall pre-easement valuation as reasonable, we accept it. For the post-easement valuation Mr. Donovan relied primarily on one sale of a tract of 2,200 scres which he considered to be usable in *212 the foressable future only for vacation retreats, and to this he added some amount for the potential value of the Treanor Tract after the 30-year easement expired. Viewing the record as a whole, we conclude that Mr. Donovan's post-easement valuation of the Treanor Tract, as well as his post-easement valuation of the Ranchettes which he considered would have a highest and best use as picnic areas or side yards to adjoining properties, to be a reasonable judgment. The post-easement valuation of the Ranchettes as made by Mr. Donovan is very close to the per acre amount paid by petitioners for the lots they bought in 1977 in the Ranchettes area prior to granting the easement. We were likewise favorably impressed by Mr. Donovan's valuation of the improvements on the property which he determined from estimated construction cost less depreciation.Mr. Donovan concluded that the pre-easement and post-easement values of the improvements would be the same since the improvements were built to be used primarily as vacation retreats, and the highest and best post-easement use of the property was as vacation retreats. In fact, the easement may benefit such use of the property. In any event, we *213 agree with Mr. Donovan that the easement affects only the value of the land, not the value of the improvements. Valuation is not an exact science and cannot be determined with mathematical precision. It is a subjective determination which requires the exercise of our best judgment considering all the facts and circumstances of record. Messing v. Commissioner,48 T.C. 505, 512, (1967). Based on the record as a whole, we conclude that Mr. Donovan's opinion of the value of the easement is a reasonable one. Based on Mr. Donovan's appraisal, as well as the record as a whole, we conclude that the fair market value of the easement granted by petitioners to the TCL on June 1, 1977, was $114,000. Decision will be entered under Rule 155.
Footnotes
1. The issue is relevant to taxable years 1978 and 1979 because of claimed carryovers of a charitable contribution deduction from the year 1977. ↩
2. Unless otherwise indicated, all statutory references are to the Internal Revenue Code of 1954, as amended and in effect during the years here in issue.↩
3. Pursuant to sec. 170(b)(1)(A)↩, the TCL qualifies as a public charity.
4. In his real estate appraisal, Mr. Doubleday concluded that this dwelling contained 1,082 square feet.↩
5. Petitioners introduced in evidence a map showing such a possible division of the Treanor Tract. This map showed one tract of 137 acres, one of 116 acres, two of 83 to 84 acres, two of 75 to 77 acres, three of 61 to 65 acres, two of 49 to 52 acres, six of 42 to 46 acres, four of 28 to 36 acres, two of 18 to 21 acres and onr of 13 acres. The 13-acre tract was adjacent to petitioners' Ranchettes lots.↩
6. Sec. 1.170A-1(c)(1), Income Tax Regs., provides: If a charitable contribution is made in property other than money, the amount of the contribution is the fair market value of the property at the time of the contribution reduced as provided in section 170(e)(1) and paragraph (a) of § 1.170A-4, or section 170(e)(3) and paragraph (c) of sec. 1.170A-4A↩.
7. Sec. 170(f)(3)(A) provides: In the case of a contribution (not made by a transfer in trust) of an interest in property which consists of less than the taxpayer's entire interest in such property, a deduction shall be allowed under this section only to the extent that the value of the interest contributed would be allowable as a deduction under this section if such interest had been transferred in trust. For purposes of this subparagraph, a contribution by a taxpayer of the right to use property shall be treated as a contribution of less than the taxpayer's entire interest in such property. ↩
8. Sec. 170(f)(3)(B)(iii) and (C)(iii) provided: (B) Exceptions.--Subparagraph (A) shall not apply to a contribution of-- * * * (iii) a lease on, option to purchase, or easement with respect to real property granted in perpetuity to an organization described in subsection (b)(1)(A) exclusively for conservation purposes, * * * * * * (C) Conservation purposes defined.--For purposes of subparagraph (B), the term "conservation purposes" means-- * * * (iii) the protection of natural environmental systems. ↩
9. Sec. 2124(e) of Pub. L. 94-455, 90 Stat. 1520, 1917, 1976-3 C.B. (Vol. 2) 656, provides that a deduction is allowed for the contribution to a charitable organization exclusively for "conservation purposes" of an easement under sec. 170(f)(3)↩ only if the contribution was made after June 13, 1976, and before June 14, 1977, and the easement was at least 30 years in duration.
10. See Thayer v. Commissioner,T.C. Memo. 1977-370; Rev. Rul. 73-339, 1973-2 C.B. 68, clarified by Rev. Rul. 76-376, 1976-2 C.B. 53↩.
11. Mr. Johnson used the following comparables and method in determining his valuation of the land over which the easement was granted: Price
Lot
Date
Per Acre
No.
Acres
of Sale
(rounded)
Land Attributes
1
1,006.77
2/79
$645
Similar to Treanor Tract
2
134.48
3/79
600
Similar to Treanor Tract
3
132   12/77
550
Cropland
4
20.07
1/78
700
Cropland
5
44   3/78
500
Pastureland
6
28.1 4/77
890
Cropland
7
10.5 6/77
762
Buildable Site
8
15.14
10/76
842
Wooded
9
2.83
4/77
700
Similar to Ranchettes
10
2.8 Not Supplied
786
In Ranchettes
On the basis of these sales, Mr. Johnson estimated the value of petitioners's land on June 1, 1977, to be as follows: ↩
1,151.15 acres of woodland at $400/acre
= $460,460
45    acres of pastureland at $550/acre
= 24,750
65    acres of cropland at $650/acre
= 42,250
81.51 acres of buildable sites at $700/acre
= 57,057
1,342.66 acres
$584,517
(rounded to $585,000)